ANTHONY DiFILIPPO and ANNE C. DiFILIPPO, Plaintiffs Below, Appellants, v. DANIEL J. PRESTON, Defendant Below, Appellee.

540

*(June* 29, 1961.)

*(Reargument denied July* 21, 1961.)

SOUTHERLAND, Chief Justice, WOLCOTT, Justice, and DUFFY, Judge, sitting.

*John M. Bader* (of Bader and Biggs) and A. James Gallo for appellants.

*Edmund N. Carpenter, II,* and *E. Norman Veasey* (of Richards, Layton and Finger) for appellee.

Supreme Court of the State of Delaware, No. 8, 1961.

WOLCOTT, J.:

This is an appeal from a judgment entered on a directed verdict for the defendant in an action for personal injuries and medical expenses resulting from alleged malpractice of the defendant, a surgeon of Wilmington, Delaware. The plaintiffs, wife and husband, appeal.

Anne C. DiFilippo, one of the plaintiffs, is a 43-year old housewife. In April of 1957 she consulted her family physician, Dr. Russo, complaining of a visible lump in her throat causing some pressure symptoms. Dr. Russo diagnosed her condition as an enlarged thyroid gland, *i.e.*, a goiter, and recommended that she consult a surgeon. Of two suggested surgeons, Mrs. DiFilippo selected Dr. Daniel J. Preston, the defendant.

Dr. Preston examined Mrs. DiFilippo and confirmed the diagnosis of Dr. Russo. He considered further tests but determined against them as inadvisable, and recommended that because of the pressure on her windpipe and because of the possibility that a goiter, *i.e.*, a diseased thyroid, might become malignant, the thyroid be removed by surgery. This operation is called a thyroidectomy.

Dr. Preston did not warn Mrs. DiFilippo about the possibility of damage to the recurrent laryngeal nerves producing loss of voice as an ultimate effect of the operation. Mrs. DiFilippo consented to have the operation performed.

Dr. Preston operated on Mrs. DiFilippo in May, 1957. The operation was uneventful. In the course of the operation, Dr. Preston was able to find no undiseased tissue in the thyroid gland and, consequently, removed 95% of the gland, leaving 5% of tissue in the posterior area to enable the gland to function partially, and also as a protection against damage to the recurrent laryngeal nerves.

This operative procedure in a thyroidectomy is one method of performing the operation. No visual exposure or examination of the recurrent laryngeal nerves is made by this technique, but a thin layer of thyroid tissue is left to make a barrier between the surgical dissection and the underlying recurrent laryngeal nerves. The technique followed by Dr. Preston is distinguished from a second technique, the so-called Lahey method, which locates and dissects out the recurrent laryngeal nerves, either entirely or partially, so as to be able to see them and thus avoid damage to them.

Since the operation Mrs. DiFilippo has been unable to speak above a hoarse whisper, the cause of which has been diagnosed as injury to the recurrent laryngeal nerves resulting in a paralysis of the vocal cords.

As a result of the paralysis of the vocal cords, in the fall of 1957, Mrs. DiFilippo was forced to submit to a tracheotomy, an operation consisting of making an opening through the patient's neck into the windpipe and the insertion of a 4-inch metal tube through which the patient breathes. Since the performance of this operation, Mrs. DiFilippo has worn constantly a tracheal tube and presumably will be forced to wear it for the balance of her life.

The theory of the action is that Dr. Preston was negligent and thus guilty of malpractice in performing the thyroidectomy as he did, and that he should have followed the so-called Lahey technique to expose to view the recurrent laryngeal nerves and thus avoid injury to them.

Dr. Preston does not deny the possibility that Mrs. DiFilippo's recurrent laryngeal nerves were damaged as a direct result of the operation performed by him. He concedes that damage could have been caused to these nerves by the operation because occasionally these nerves are in an abnormal position anatomically, and occasionally run through the thyroid rather than behind it. He contends, however, that he was

not negligent in selecting the technique used by him because it is a standard technique accepted and recognized by surgeons.

He recognizes that there is a dispute among surgeons as to which method for the performance of thyroidectomies is better. He contends, however, that the incidence of damage to the recurrent laryngeal nerves as a result of thyroidectomies is about the same, irrespective of which technique is followed. Consequently, he contends that a surgeon is not negligent, or guilty of malpractice, if he adopts either technique if the operation is performed, as this one admittedly was, with due care and in accordance with the accepted standards for the conduct of an operation following the particular technique.

The plaintiffs make several points as reasons why the judgment below should be reversed and a new trial ordered. However, we do not consider these points in the precise order or form in which they are raised. We take this approach because we think, upon analysis, the case presents one fundamental question.

This question is whether or not the selection by Dr. Preston of the surgical technique followed in this thyroidectomy was, of itself, negligent. If it was then a verdict against him would be justified. If, however, the selection of this technique was not a negligent act, then it follows that Dr. Preston has been exonerated of negligence. We say this because there is no evidence in this record that Dr. Preston failed to perform the operation by the technique selected by him in accordance with due care and the standards of competence demanded of surgeons employing the particular technique.

The general rule is that a surgeon is bound to the same standards of care and competence as other surgeons in good standing ordinarily adhere to in the same or a similar community. 41 *Am. Jur.*, Physicians and Surgeons, § 82; 70 *C. J. S.* Physicians and Surgeons § 43. This general rule

is also the law of Delaware. *Christian v. Wilmington General Hospital*, 11 *Terry* 550, 135 *A.* 2d 727; *Mitchell v. Atkins*, 6 *W. W. Harr.* 451, 178 *A.* 593.

What, then, is the standard to which a surgeon of Wilmington is to be held in the performance of a thryroidectomy? Of necessity, that standard is a question of fact to be determined by the testimony of expert witnesses. *Christian v. Wilmington General Hospital, supra.* We therefore turn to the testimony of the medical expert witnesses called in behalf of the defendant, and also the testimony of Dr. Graubard, a New York surgeon, called by the plaintiffs, whose testimony we consider under this phase of the case as being part of the record before us, although it was actually struck from the record by the trial judge.

The defendant called three surgeons as experts, two of whom were practicing surgeons in the Wilmington area, and the third of whom was an admittedly qualified if not leading surgeon of the Philadelphia area, whose testimony indicates a familiarity with the standards of competence required in the Wilmington area. These three experts are in general agreement as to the recognized and accepted techniques for the surgical treatment of infected thyroids, *i. e.*, goiters, and the performance of thyroidectomies. Their testimony may be summarized as follows.

Surgeons generally recognize that in the performance of thyroidectomies there is a risk of resultant injury to the recurrent laryngeal nerves because of the intimate relationship of those nerves to the thyroid gland, and because of variations in individuals of the course of those nerves around or, in some cases, even through the thyroid gland. The possibility of resultant injury to these nerves is heightened because of their structure, which means that it is not necessary to cut the nerve to injure it. Injury may result by a mere squeezing or stretching. One of the main problems in a thyroidectomy is, therefore, to perform the operation in a manner to avoid

resulting injury to the nerves or, at least, minimize the possibility of such injury.

One recognized method or technique to accomplish this is to remove a major part of the thyroid gland by dissection, leaving a small residue of tissue in the area where the nerves would normally be located as a shield or a buffer against the dissection. In this technique, no attempt is made by the surgeon to see, identify and separate the nerves from the thyroid in order to avoid injury to them. The surgeon following this technique relies on his knowledge of the area of the gland adjacent to the nerves and by avoiding dissection of that area, attempts to protect the nerves from injury. This technique is referred to in the record as the standard technique and was the one followed by Dr. Preston in operating upon Mrs. DiFilippo.

The second or alternative method or technique is named for its originator, Dr. Lahey, who proposed that in a thyroidectomy the recurrent laryngeal nerves be visualized by the surgeon. This is done by cutting into the area in which the nerves normally lie, identifying the nerves, and putting them aside from the area in which the dissection is to take place. The Lahey technique is of more recent origin and is gradually receiving wider acceptance among surgeons, but among qualified surgeons there still exists a difference of opinion as to which technique is preferable.

Neither technique for the performance of thyroidectomies wholly eliminates the possibility of resulting damage to the recurrent laryngeal nerves. Such possibility exists in the so-called standard technique because the nerves may not be in their normal location and position. Such possibility exists in the Lahey technique because the mere handling of the nerves and the difficulty of identifying them may inadvertently be sufficient to cause damage to them, either through cutting, stretching or squeezing. Particularly is this so in the Lahey technique in the case of a diseased thyroid because

such a gland is more likely to be tightly adherent to the surrounding tissue and to parts of the nerves, a circumstance which thus increases the hazard of exposing them.

Either of the two above described techniques for the performance of thyroidectomies is recognized by surgeons generally as acceptable and as conformable to the standards required of surgeons, not only in the Wilmington area, but probably throughout the country. In the use of either technique, even though the surgeon uses meticulous care in the operation, statistics show an incidence of permanent damage to the recurrent laryngeal nerves of about 2%.

Plaintiffs insist that Dr. Graubard took a diametrically opposed view to that of the three surgeons called as experts by the defendant, thus creating an issue of fact to be resolved by the jury. Plaintiffs contend that Dr. Graubard, whom, for this purpose, we assume to be qualified to testify with respect to standards required of surgeons in the Wilmington area, testified that the only acceptable standard for the performance of thyroidectomies was the Lahey technique. We think, however, a careful reading of his testimony demonstrates that it is more accurate to say that he recognized the existence of the two techniques; that there was a division of opinion among qualified surgeons as to which was the better, but that he personally thought the Lahey technique was the only proper one to be used.

While Dr. Graubard might well prefer the Lahey technique, at least an equal number of his fellow surgeons throughout the country apparently prefer the so-called standard technique. Since both are recognized as acceptable, it follows that the choice by Dr. Preston of one of two acceptable techniques was not a negligent act on his part. 70 *C. J. S.* Physicians and Surgeons § 44; Annotation, 162 *A. L. R.* 1265.

We think, therefore, that the plaintiffs failed to make a submissible issue of negligence for the jury and that, conse-

quently, on this phase of the case the direction of a verdict for the defendant was proper.

Plaintiffs argue that the trial court improperly struck from the record the testimony of Dr. Graubard, and that, accordingly, a new trial should be ordered. The trial judge ordered the testimony of Dr. Graubard struck because of his conclusion that he was not sufficiently familiar with the professional standards of surgeons in the Wilmington area or in a community of like size and character to testify with respect to what those standards were.

We have, however, considered the main question in this appeal as though Dr. Graubard's testimony was before us, and have concluded that it is not in fundamental disagreement with the expert medical testimony offered by the defendant. It is thus apparent that even if it was error to strike his testimony, that error cannot change the result.

Plaintiffs also argue that the trial judge committed error in refusing to permit Dr. Russo, a Wilmington general practitioner, to testify as an expert witness with respect to the proper surgical techniques to be followed in thyroidectomies. We are of the opinion, however, that the refusal of the trial judge to permit Dr. Russo to so testify was not error. By his own testimony on *voir dire*. Dr. Russo admitted his inability to testify as to standards required of surgeons. He was asked if he knew what methods of performing thyroidectomies would be recognized as standard and acceptable in the Wilmington area, and he answered, "No, I do not. Not at the present day. No, sir." This answer of the witness, we think, disqualified him as an expert to testify with respect to proper standards of modern thyroid surgery.

It is true that the plaintiffs argue that Dr. Russo was called to testify not as to surgical techniques but as to a question of anatomy, *i.e.*, the normal position of the recurrent

laryngeal nerves, but we think the argument is one of desperation since the record of Dr. Russo's testimony clearly indicates that the plaintiffs hoped to elicit from his testimony that the exposure of the recurrent laryngeal nerves was accepted as the better surgical method. With respect to this, however, the doctor testified he did not know.

Next, plaintiffs argue that the doctrine of *res ipsa loquitur* required the trial judge to submit the case to the jury. The argument is that, since admittedly Dr. Preston did not visualize the recurrent laryngeal nerves, the purpose of which is to protect them, his failure to do so thus gives rise to an inference of negligence. It is argued that since the injury to Mrs. DiFilippo's vocal cords was the result of the operation, and since there was no visualization of the nerves, it follows that the jury could have found that it was negligent of Dr. Preston not to follow the technique of visualizing the nerves.

The doctrine of *res ipsa loquitur*, however, is not applicable in malpractice actions in which the only proof is the fact that the treatment of the patient terminated with poor results. 41 *Am. Jur.*, Physicians and Surgeons, § 127; *Christian v. Wilmington General Hospital, supra*. A *sine qua non* to the application of the doctrine is that the resulting injury must be of a kind which ordinarily does not occur in the absence of negligence. In this case the undisputed testimony is that injuries of this type do occur about 2% of the time, irrespective of how careful the surgeon is and irrespective of which surgical technique he adopts.

The facts, therefore, do not justify an inference of negligence of such force as to call for an explanation from the defendant. When such is the case, *res ipsa loquitur* has no application. *Ciociola v. Delaware Coca-Cola Bottling Co., Del.*, 172 *A*. 2d 252.

Plaintiffs refer us to a number of decisions of other states applying the doctrine of *res ipsa loquitur* in malpractice ac-

tions. An examination of these decisions, however, shows them to be not in point. They uniformly are cases in which the resulting injury to the patient was so inconsistent with the normal and usual result, that an inference of negligence was forcibly required. Many of these cases are collected in an annotation at 162 *A. L. R.* 1258. We think that they are not persuasive in the case before us.

The plaintiffs make an argument based upon the admitted fact that Dr. Preston did not warn Mrs. DiFilippo of the possibility that a thyroidectomy might result in injury to the recurrent laryngeal nerves and paralysis to the vocal cords. Because of this, it is argued, Mrs. DiFilippo never gave an informed consent to the operation with the result that Dr. Preston is responsible for the injurious effects of his assault and battery. Plaintiffs cite *Paulsen v. Gundersen,* 218 *Wis.* 578, 260 *N. W.* 448, and *Wall v. Brim,* 5 *Cir.,* 138 *F.* 2d 478. It is argued that a surgeon owes to his patient a duty of disclosure of specific known risks, subject to the exception of the existence of an emergency, and further subject to the exception that he is under no duty to disclose when disclosure would be likely to bring about harmful results. *Natanson v. Kline,* 186 *Kan.* 393, 350 *P.* 2d 1093.

Plaintiffs, of course, argue that neither exception to the rule requiring disclosure are present in the case at bar. They argue that there was no emergency facing Mrs. DiFilippo; that there was no really vital need for the operation, and that there was not indication that disclosure would have unduly alarmed her. Under the circumstances, therefore, it is contended that Dr. Preston had the duty to warn her of possible unfavorable results.

Whether or not a physician or surgeon is under a duty to warn a patient of the possibility of a specific adverse result of a proposed treatment depends upon the circumstances of the particular case, and of the general practice with respect to such cases followed by the medical profession

in the locality. *Fischer v. Wilmington General Hospital*, 1 *Storey* 554, 149 *A.* 2d 749. The custom of the medical profession to warn must be established by expert medical testimony. *Natanson v. Kline, supra; Christian v. Wilmington General Hospital, supra.* And see, also, Case Note, 109 *Pa. L. Rev.* 768.

██ In the case before us, all the expert medical testimony agreed that it was not the practice of surgeons in the Wilmington area to warn patients of the possibility of resultant injury to the recurrent laryngeal nerves from a thyroidectomy. This being the undisputed fact, it follows that there was no duty imposed on Dr. Preston to warn Mrs. DiFilippo of this specific possibility. Indeed, the general tenor of the medical testimony would seem to justify the inference that warning under the circumstances of this case would have been a departure from the usual custom or standard.

██ Finally, the plaintiffs argue that it was error for the trial judge to have granted defendant's motion for trial by special jury. Since, however, we have found no error in the record requiring us to remand the case for trial, the question is now moot.

For the foregoing reasons, the judgment below is affirmed.