L. W. BALL and LORENE W. BALL, Plaintiffs in Error, v. MALLINKRODT CHEMICAL WORKS et al., Defendants in Error.—381 S.W.(2d) 563.

Eastern Section. January 16, 1964.

Certiorari Denied by Supreme Court May 8, 1964.

220

Dietzen, Graham & Dietzen, Chattanooga, for plaintiffs in error.

Spears, Moore, Rebman & Williams, Chattanooga, for defendant in error, Dr. Jesse E. Adams.

Strang, Fletcher, Carriger & Walker, Chattanooga, for defendant in error, Mallinkrodt Chemical Works.

McAMIS, P.J. Mrs. Lorene Ball brought suit against Dr. Jesse Adams, a vascular surgeon, charging malpractice in the performance of a test known as translumbar aortogram by the injection of Urokon 70, manufactured and sold by the defendant Mallinkrodt Chemical Works. Her husband sued in a separate action for loss of services and medical expenses incurred in the treatment of Mrs. Ball. The two cases were tried together.

The Court refused to allow the case to go to the jury as to certain charges contained in the declarations but, as to others, the motion for a directed verdict was overruled. The jury returned a verdict for both defendants in which the Court concurred. From the judgment dis-

missing both suits, plaintiffs have appealed and assigned errors.

As to Dr. Adams, the Court submitted to the jury the charge that, in performing the aortogram, he negligently selected Urokon 70, a toxic, unsafe and unsuitable substance, as the contrast agent for taking X-ray pictures of the renal arteries and that in obtaining Mrs. Ball's consent to the procedure he failed sufficiently to advise her of the danger of paralysis and other possible serious consequences.

The court submitted to the jury as to Mallinkrodt Chemical Works the charge that in manufacturing and selling Urokon 70 it knew or should have known that it was an unsuitable and unsafe contrast agent for making aortograms and thus breached an implied warranty of fitness and was guilty of proximate negligence.

In January, 1960, Mrs. Ball consulted Dr. David McCallie for symptoms of high blood pressure which was found upon examination by Dr. McCallie to be 240/150. On his recommendation she was hospitalized. Dr. Mc-Callie treated her for this condition without success and without a determination of its cause at intervals until June 22, 1961. At that time Dr. McCallie advised her that it might be possible to determine by means of the diagnostic procedure known as translumbar aortogram whether, as is sometimes the case, her high blood pressure was being caused by a partial blocking of the renal arteries leading to the kidneys. Dr. Adams, a specialist in this field, was called in to perform the test.

As we understand, this procedure consists of passing a flexible tube syringe through the patient's back and against the wall of the aorta, the large artery leading

off in an upward direction from the heart. A long needle is then inserted within the tube and forced through the lumen or outer wall of the aorta. The contrast agent is then forced through the needle into the aorta and passes very rapidly into the renal arteries leading down to the kidneys, permitting the taking of X-ray pictures of these arteries to show any existing obstructions.

Almost immediately after the injection of Urokon 70 by Dr. Adams, Mrs. Ball experienced the most excruciating pain in her chest and abdomen. This was shortly followed by a numbness and paralysis of both legs, one of which continues to be paralyzed and almost, if not entirely, useless. The X-ray pictures taken during the test show that some of the solution escaped outside the aorta. It is the insistence of plaintiffs that it then migrated to the spinal cord causing damage which resulted in paralysis of Mrs. Ball's leg and some impairment of nerves controlling bowel and kidney action.

Conceding that Mrs. Ball suffered these injuries as the result of the use of Urokon 70, defendants insist that, in spite of the utmost skill and care on the part of the surgeon making the test, the escape of dye outside the aorta occurs in about five to ten percent of the cases and that even where this occurs the extravasated dye is absorbed by the system without harmful effect except that it causes the patient severe pain for two or three hours. It is defendants' theory and insistence that the Urokon 70 which caused the damage to Mrs. Ball's spinal cord passed through the needle into the aorta and thence into the arteries feeding the spinal cord and that this is a danger inherent in the test since it occurs in spite of all precautions which can be taken in about one per cent

of all cases, no matter what contrast agent is used or how skillful the surgeon may be.

■ Considering first plaintiffs' insistence that there is no evidence to sustain a finding that defendants were guilty of no negligence, we find that from 1954 until and including 1960, when the test on Mrs. Ball was made, Urokon 70 was the contrast agent chosen by at least half the surgeons performing aortograms in the United States. This choice was made despite the existence of other available agents considered by some to be less toxic because the use of Urokon 70 permitted the taking of better X-rays of the renal arteries. There is material evidence, however, that no contrast agent is completely safe.

Some of the foremost practicing and teaching surgeons testified that, knowing its toxic nature, they have used Urokon 70 because it gives the best picture and, since the test is a severe and somewhat dangerous procedure used only in extreme cases when all else has failed, it is deemed unwise to have the patient undergo the test without a reasonable expectation that a satisfactory picture can be obtained.

■ It is well settled that where the treatment or procedure is one of choice among competent physicians a physician can not be held guilty of malpractice in selecting the one which, according to his best judgment, is best suited to the patient's needs. The principle is so well established that a review of the authorities would be superfluous. See, however, Quinley v. Cocke, 183 Tenn. 428, 192 S.W.(2d) 992; Gresham v. Ford, 192 Tenn. 310, 241 S.W.(2d) 408; Floyd v. Walls, 26 Tenn.App. 151, 168 S.W.(2d) 602.

■ There was abundant evidence from which the jury might conclude that Dr. Adams in the exercise of his best judgment chose the proper contrast agent for making the test and that its use is sanctioned and approved by competent medical authorities.

■ We are also of opinion under the same evidence it was for the jury to say whether there was a breach of an implied warranty of fitness or negligence on the part of Mallinkrodt Chemical Works in making Urokon 70 available for use by competent and skilled surgeons in the performance of aortograms.

■ As to Dr. Adams, it is insisted the Court erred in refusing to submit to the jury the insistence of plaintiffs that he negligently used 24 c.c. of Urokon 70, negligently injected the dye outside the aorta, failed to take a preliminary X-ray known as a scout film to show the position of the needle before making the injection, and negligently failed to use a safer medium.

We think the Court ruled correctly as to all of these issues. Although the manufacturer's brochure stated that the proper amount was 15 c.c.s, Dr. Adams testified that he used 24 c.c.s because he thought it necessary in order to get a good picture. There is competent medical testimony that according to the best usage and practice 24 c.c.s is within the permissible range, bearing in mind that the sole purpose of the test is to get a satisfactory view of the renal arteries.

As to the spilling of the dye outside the aorta, there is no evidence that extravasation can be avoided by proper care or that it never occurs where proper skill has been exercised. Dr. Wood, a general practitioner, testified that, unless the patient moves, the needle should not come

out if the surgeon maintains the proper pressure on the needle. Dr. Wood, however, had never made an aortogram and obviously left out pertinent factors such as the contraction of the aorta. The evidence by competent surgeons is that in spite of all precautions and the greatest skill on the part of the surgeon, extravasation occurs in 5 or 10 per cent of all cases. This is true not because the needle never entered the aorta but because the natural contractions of the aorta, a movement of the patient or the jet action of forcing the fluid into the aorta causes the needle to be pushed out before the injection is completed.

█ We are also of opinion, in view of the evidence offered by both plaintiffs and defendants that some of the dye which enters the aorta ultimately reaches the spinal cord and may cause nerve damage, it is a matter of pure speculation even when the evidence is viewed in the light most favorable to plaintiffs, whether the extravasated dye caused Mrs. Ball's injuries. Dr. Pontassie, a witness for plaintiffs, testified that nerve damage in the spine occurs in cases where there has been no extra aortic injection of dye. There is no evidence to the contrary and all of the evidence is in accord on that question.

█ As to the taking of a scout picture, again the proof shows that this is a matter of choice upon which competent and skilled surgeons in this specialized field differ. Dr. Adams testified that, with the available equipment, to take such a picture it would have been necessary to move the patient which he did not think would have been wise and, as an additional reason, he could tell by the feel that the syringe had broken through into the aorta and as further evidence of penetration that blood was

forced back into the syringe by the pulsations of the aorta. In any case, the X-ray clearly shows the presence of dye in the aorta and it is apparent that failure to take a scout film had nothing to do with extravasation of dye, assuming, contrary to what has been said above, that extravasation could have caused Mrs. Ball's injuries.

In view of the evidence of conflicting medical opinion as to the use of Urokon 70 above discussed it is not necessary to discuss the court's alleged failure to submit to the jury Dr. Adams' choice of Urokon 70 rather than one of the less toxic media. We think this question was necessarily comprehended within the question of his use of Urokon 70 which the jury considered.

It is next insisted the court erred in charging the jury:

"It is also the duty of a physician or surgeon to disclose to the plaintiff facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment. Where the consequences are serious and substantially certain to occur, it is the physician's or surgeon's duty to disclose such facts to the patient. The physician may not minimize the normal operation in order to induce the patient's consent, at the same time the physician must place the welfare of his patient above all else, and the very fact places him in a position in which he must sometimes choose between two alternate courses of action, one is to explain to the patient every risk attendant upon any surgical procedure or operation, no matter how remote. This may well result in alarming a patient who is already unduly apprehensive and who may, as a result, refuse to undertake the surgery which there is, in fact, minimal risk. It may also actually in-

crease the risk by reason of the psychological result of the apprehension of it. The other is to recognize that each patient presents a separate problem, that the patient's mental and emotional condition is important and in certain cases may be crucial, and that in discussing the elements of risk a certain amount of discretion must be employed consistent with the full disclosure necessary for an informed consent."

It is said there was no evidence that Mrs. Ball would have been emotionally disturbed if she had been told that paralysis might occur and that the assumption in the charge that she would have been so affected took that question from the jury. There was expert evidence before the jury that the reason justifying a physician's failure to warn the patient in every case is the possibility of upsetting the patient and that each patient must be judged by the physician in charge. We think this evidence justified the charge and the assignment complaining of this portion of the charge is overruled.

It is insisted under the 12th assignment of error that the court erred in excluding the testimony of Dr. Wood that extravasation would not occur if the surgeon uses proper precautions. This evidence, as above noted, was before the jury. We do not find that the jury was ever told to disregard it.

 Other assignments relating exclusively to the case against Mallinkrodt will next be considered.

Two of the assignments in this group are that the court erred in directing a verdict against plaintiffs (1) on the charge that Mallinkrodt in its sales brochure warranted that Urokon 70 was of "low toxicity" and "comparatively safe for translumbar aortography", and

(2) should have allowed the jury to pass on Mallinkrodt's failure to warn prospective users of the risk of paralysis.

The sales brochure stated in pertinent part as follows:

"Through extensive clinical uses Urokon Sodium has been found to be a comparatively safe preparation for the techniques described or referred to in the previous sections. Because of its low toxicity and high opacity to X-rays, it may prove to be useful in still other diagnostic procedures. However, this preparation is not recommended for use as a contrast medium in bronchography and venography at this time, since insufficient clinical data have been collected to assure the most suitable and safe method of administration in these techniques. Furthermore, while Urokon Sodium 30% is recommended for use in cerebral angiography, Urokon 50% and 70% must never be used in this procedure."

Urokon 70 is exclusively a prescription product and used only by highly trained surgeons in this specialized field.

Dr. Adams testified that although he had read the brochure he relied in the main upon his long experience in using it. He was well aware that experiments with dogs had shown it to be more toxic than other agents on the market but, in spite of this, chose to use it because he considered it best in order to get a good picture. Mrs. Ball did not know what agent Dr. Adams intended to use and certainly did not rely upon the brochure.

Since there was no evidence that Dr. Adams relied upon the brochure and all of the evidence shows that he was fully aware of the toxicity of Urokon 70, there was no error in refusing to submit these questions to the jury.

230

██ It is also insisted the court erred in not submitting to the jury the charge that Mallinkrodt violated the Tennessee Food, Drug and Cosmetic Act, T.C.A. sec. 52-103, by putting on the market a misbranded drug, in that the brochure was false and misleading. We can not say the brochure was false or misleading when it is remembered that it was strictly a prescription drug used only by skilled surgeons. It is true the term "low toxicity" is used, but this language was used in connection with its possible use in other diagnostic procedures not here pertinent. Toxicity is a relative term. What would be highly toxic under one set of circumstances might be considered "low toxicity" under different circumstances and in a different part of the body where it would be quickly diluted by blood as in the case of aortography, here involved. We find no error in refusing to submit this issue to the jury.

██ Plaintiffs insist the Court erred in charging as requested by Mallinkrodt that failure of a party to call a witness gives rise to no presumption that his testimony would have been unfavorable. It is insisted this deprived plaintiffs of the inference that the testimony of Dr. Hallett, the chemist in charge of production and development of drugs for Mallinkrodt who was present in the court room, would have been unfavorable to Mallinkrodt. While we think even when taken as a whole this charge was not strictly accurate and correct, Management Services, Inc. v. Hellman, 40 Tenn.App. 127, 289 S.W.(2d) 711; Tindell v. Bowers, 31 Tenn.App. 474, 216 S.W.(2d) 752, we do not feel that it affected the result of the trial and, for that reason, plaintiffs are not entitled to a new trial on that ground. T.C.A. sec. 27-117.

 This brings us to the insistence, applicable alike to both defendants, that the Court erred in not polling the jury as plaintiffs requested and erroneously held that plaintiffs had waived their right to have the jury polled. The record reveals that the jury first reported that it had found for the defendants in the case of Mrs. Ball. The Court then inquired, "So say you all? Now, do you all agree that that is your verdict?" According to the record the jurors noded affirmatively. No request for a poll was made in Mrs. Ball's case until after the following had occurred.

The Court then inquired as to the verdict in the case of L. W. Ball, the husband. The foreman of the jury thereupon attempted to tell something about what the jury understood but was interrupted and told that if Mrs. Ball could not recover, the action of the husband would also fail. The jury then retired and later reported that its verdict in the husband's suit was in favor of defendants and when the Court inquired, as above, whether that was the verdict of all jurors, no dissenting expression was noted and "Jurors nodded affirmatively". The Court then said "All right", whereupon plaintiffs' counsel requested a poll of the jury, to which the Court said:

"You waived it by not asking for it."

It seems to us if a poll of the jury was desired it should have been requested when the jury returned its verdict in Mrs. Ball's case. Instead the request was not made until the jury had retired to consider the husband's case and the verdict in that case had been accepted by the Court as indicated by the expression "all right."

The right to have the jury polled is not a constitutional right. It is conferred by statute, T.C.A. sec. 20-1324,

and will be considered waived unless it is requested at the time the verdict is returned. See 53 Am.Jur. 704.

The principal suit was that of Mrs. Ball. The rights of the husband were dependent upon the outcome of that case. Yet, when the verdict in that case was returned no request for a poll was made and none was made until after the verdict had been returned and accepted in the case of Mr. Ball. Under the circumstances we can not say the Court erred in holding that the right to a poll was waived.

For the reasons indicated the judgments are affirmed at plaintiffs' cost.

Cooper, J., and Milligan, Special Judge, concur.