FRANCES T. NISHI, EXECUTRIX OF THE ESTATE
OF PAUL T. NISHI, DECEASED, AND FRANCES
T. NISHI, INDIVIDUALLY *v.* DR. ALFRED S.
HARTWELL AND DR. NIALL M. SCULLY.

No. 4758.

JULY 21, 1970.

RICHARDSON, C.J., MARUMOTO, ABE, KOBAYASHI, JJ., AND
CIRCUIT JUDGE KABUTAN IN PLACE OF LEVINSON, J.,
DISQUALIFIED.

OPINION OF THE COURT BY MARUMOTO, J.

This is an appeal by plaintiffs from a circuit court judgment dismissing their medical malpractice action against Dr. Alfred Hartwell and Dr. Niall Scully. Dr. Hartwell is a cardiovascular specialist, and Dr. Scully is a thoracic surgeon. Both practice their profession in Honolulu. The judgment was entered upon the granting of defendants' motion to dismiss at the close of plaintiffs' case in a trial before a jury.

The action was originally brought by Dr. Paul Nishi, a Honolulu dentist, and his wife Frances. Dr. Nishi sought to recover damages for the physical disability he suffered from undergoing a diagnostic surgical procedure known as thoracic aortography, which was recommended by Dr. Hartwell and performed by Dr. Scully. Mrs. Nishi sought recovery for loss of consortium on account of her husband's physical disability. Dr. Nishi died during the pendency of the action in the circuit court. After Dr. Nishi's death, Mrs. Nishi pressed Dr. Nishi's claim in her

capacity as executrix of his estate, besides pressing her own claim in her individual capacity.

Plaintiffs' right of recovery in the action depends on whether Dr. Nishi had a good claim for relief during his lifetime.

The purpose of thoracic aortography is to determine the existence of aneurysm. The procedure involves an exposure of an artery in the inguinal region, followed by an injection of radio-opaque contrast medium through a catheter so that the concentration of the contrast medium will outline the aorta under X-ray.

Dr. Scully performed the procedure pursuant to consent signed by Dr. Nishi and Mrs. Nishi, concededly with professional competence. However, after the procedure was completed, Dr. Nishi was paralyzed from the waist down and had no control of his bowel and bladder. It is admitted that this condition occurred as a side effect of Urokon, the contrast medium which Dr. Scully used in the procedure. Neither Dr. Hartwell nor Dr. Scully apprised Dr. Nishi of the danger before he submitted himself to the procedure, although both were aware of the existence of such collateral hazard.

Plaintiffs framed their complaint as an action sounding in battery, their theory being that defendants' failure to disclose the risk vitiated the consent in this case and the performance of the procedure in the circumstance constituted an unlawful touching of Dr. Nishi's body.

Battery is an unlawful touching of another person without his consent. *Schloendorff* v. *Society of New York Hospital,* 211 N.Y. 125, 105 N.E. 92 (1914). A touching with consent, but of a different nature or scope from that to which consent was given, is also battery. *Bang* v. *Charles T. Miller Hospital,* 251 Minn. 427, 88 N.W.2d 186 (1958); *Gray* v. *Grunnagle,* 423 Pa. 144, 223 A.2d 663 (1966).

This case is different. Here, the touching was with consent and was of the same nature and scope as that to which the consent was given, but involved an undisclosed collateral hazard. Cases such as this involve the doctrine of informed consent, and are deemed to sound in negligence, as raising the question of a neglect of duty required to be observed by a physician in his relationship with his patient. *Natanson* v. *Kline,* 186 Kan. 393, 350 P.2d 1093, *rehearing denied,* 187 Kan. 186, 354 P.2d 670 (1960); *Aiken* v. *Clary,* 396 S.W.2d 668 (Mo. 1965); Marcus L. Plante, *An Analysis of "Informed Consent",* 36 Fordham L. Rev. 639 (1968).

Thus, we treat this as a negligence action. The right of a plaintiff to relief does not depend upon his allegations or his theory of the case. H.R.C.P. Rule 15(b); *Territory* v. *Branco,* 42 Haw. 304, 311 (1958).

The doctrine of informed consent imposes upon a physician a duty to disclose to his patient all relevant information concerning a proposed treatment, including the collateral hazards attendant thereto, so that the patient's consent to the treatment would be an intelligent one based on complete information. *Salgo* v. *Leland Stanford Jr. University Board of Trustees,* 154 Cal. App. 2d 560, 317 P.2d 170 (1957).

However, the doctrine recognizes that the primary duty of a physician is to do what is best for his patient and that a physician may withhold disclosure of information regarding any untoward consequences of a treatment where full disclosure will be detrimental to the patient's total care and best interest. *Salgo* v. *Leland Stanford Jr. University Board of Trustees, supra; Watson* v. *Clutts,* 262 N.C. 153, 136 S.E.2d 617 (1964).

In this connection, it is also recognized that no hard and fast rule can be stated as to the circumstances which will excuse withholding of full disclosure and as to the

kind of information to be withheld, and that each case will depend on its particular facts. *Watson* v. *Clutts, supra; Govin* v. *Hunter,* 374 P.2d 421 (Wyo. 1962).

Thus, in *Watson* v. *Clutts, supra,* it is stated: "Difficulty arises in attempting to state any hard and fast rule as to the extent of the disclosure required. The doctor's primary duty is to do what is best for the patient. Any conflict between this duty and that of a frightening disclosure ordinarily should be resolved in favor of the primary duty."

Plaintiffs' presentation of their case showed the following facts:

Dr. Nishi had a history of hypertension and chronic kidney ailments, dating back to 1929, and was originally under the care of Dr. Kazuo Miyamoto, his personal friend and family physician. On the morning of October 18, 1959, he had severe and recurring attacks of chest pain, and Dr. Miyamoto referred him to Dr. Hartwell, who immediately hospitalized him for observation and taking of X-rays. His pain persisted after hospitalization, and required frequent administration of Demerol for relief. Demerol is a narcotic.

When X-rays indicated that Dr. Nishi might be suffering from aneurysm, Dr. Hartwell discussed with Dr. Nishi and Mrs. Nishi a plan to send Dr. Nishi to Houston, Texas, for surgery by Dr. Michael DeBakey of Baylor University. Dr. Nishi and Mrs. Nishi concurred in the plan. However, Dr. Hartwell felt that it was inadvisable to send Dr. Nishi to Houston without a definite determination that he had aneurysm. Thoracic aortography is the recognized procedure for making the determination. So, after consulting Dr. Scully, Dr. Hartwell recommended the procedure to Dr. Nishi and obtained his consent to its performance by Dr. Scully. In making the recommendation,

Dr. Hartwell explained the procedure to Dr. Nishi but said nothing to him about the attendant collateral hazard. Dr. Hartwell's reasons for the omission appear in the following excerpts of his testimony:

"He had chronic kidney disease, having been operated on, either two or three times since 1929, for kidney stone, with a good deal of chronic infection resulting therefrom and some kidney damage. * * * [H]e was gravely ill—because the pain was so severe, he required Demerol injections * * *; he was literally riding with it, at times.

* * * * *

"Each person is different. This man was very well-educated, a fine man, but, in addition, he was very frightened about his condition, he was apprehensive, and this actually guided our hand in much of what we did because if a man has a serious heart disease, with hypertension, and you thereupon frighten him further, you have a problem which you have created. * * *

* * * * *

"* * * I mentioned he had high blood pressure, he had pain in his chest which we were trying to find an answer to, and if I had sat down with Dr. Nishi and said, 'We are about to inject something into you which has a remote chance of causing you to be paralyzed, you may get an immediate reaction which will cost you your life,' if I had said these things to Dr. Nishi, I think it would have been a terrible mistake. * * *

* * * * *

"* * * Now, we are living * * * in this trial in the climate of knowing that no aneurysm existed, but the climate before this was quite different. * * * Prior to our doing this aortogram, we had discussed his being

sent to Texas, Mrs. Nishi was to be instructed in how to give him shots of Demerol.

*  *  *  *  *

"* * * Now when it was found * * * that we might be able to do an aortogram and perhaps save him the trip, both Dr. Nishi and Mrs. Nishi were very delighted * * *. You will recall, also, that Dr. Nishi is a professional man, he's a dentist. I would dare say he's given thousands of injections of novocaine and he knows, as well as I * * * that every time you inject anything into somebody, a hazard exists, so that it didn't seem necessary to tell this professional man, 'Now is it a hazard?' He knows it. And, therefore, not very much was said to him by me about the dangers of the procedure. I wished to reassure him that we were doing everything we could to find the cause of his pain and so I think, in talking to him, I said 'This is a fairly simple procedure, it simply is an injection of material into your circulation so we can outline the swelling or widening of your aorta.' "

Dr. Scully also explained the procedure to Dr. Nishi. He did so independently of Dr. Hartwell. In his explanation, he went into the technical aspects of the procedure in greater detail than he would have done with average laymen; but, as in the case of Dr. Hartwell, omitted any mention of attendant collateral hazard. He gave two reasons for the omission. One was that he thought that full disclosure would not be in Dr. Nishi's best medical interest in view of the psychological condition of Dr. Nishi alluded to in Dr. Hartwell's testimony. The other was that Urokon was practically the only satisfactory contrast medium then available for the procedure and he was of the opinion that the chance of the collateral hazard materializing from its

use was relatively minimal.[1] The procedure here was performed on November 3, 1959.

From the explanations given to him, Dr. Nishi had an understanding of the general nature and purpose of the procedure. He stated in his deposition that he knew that his femoral artery would be opened, then a tube would be placed in the artery and a dye would be injected through the tube; that he was not told, and did not inquire, about the kind of dye which would be used; that he did not make any detailed inquiry because he relied on his doctors, including Dr. Miyamoto; and that he was in pain and was desperate to find out where the pain was coming from.

The evidence recited above was uncontradicted. It brought defendants' omission to disclose clearly within the exception to the duty of full disclosure which excuses the withholding of information for therapeutic reasons. Under the showing made, we do not think that reasonable minds can differ on this point. Consequently, we hold that the circuit court properly granted defendants' motion to dismiss.

The dismissal of the action may also be supported on another ground.

In determining the question of physician's liability for nondisclosure courts generally follow the rule applicable to medical malpractice actions predicated on alleged negligence in treatment which requires the question of negligence to be decided by reference to relevant medical standards and imposes on the plaintiff the burden of proving the applicable standard by expert medical testimony. *Shetter*

---

[1] In Ball v. Mallinkrodt Chemical Works, 53 Tenn. App. 218, 381 S.W.2d 563 (1964), the court found that from 1954 to 1960, Urokon was the contrast medium chosen by at least one half of the surgeons performing aortography in the United States, and the choice was made despite the existence of other media considered by some to be less toxic because its use permitted the taking of better X-rays. Also, a study conducted by Dr. DeBakey and completed in 1962 showed 2 deaths in 3,800 cases, or an incidence of death of .05 percent.

v. *Rochelle*, 2 Ariz. App. 358, 409 P.2d 74 (1965); *DiFilippo* v. *Preston*, 53 Del. 539, 173 A.2d 333 (1961); *Ditlow* v. *Kaplan*, 181 So. 2d 226 (Fla. App. 1965); *Grosjean* v. *Spencer*, 258 Iowa 685, 140 N.W.2d 139 (1966); *Roberts* v. *Young*, 369 Mich. 133, 119 N.W.2d 627 (1963); *Aiken* v. *Clary, supra; Petterson* v. *Lynch*, 59 Misc. 2d 469, 299 N.Y.S. 2d 244 (1969); *Anderson* v. *Hooker*, 420 S.W.2d 235 (Tex. Civ. App. 1967); *Govin* v. *Hunter, supra.*

In this case, plaintiffs did not adduce any expert medical testimony to establish a medical standard from which the jury could find that defendants deviated from their duty to Dr. Nishi. The only medical standard established here justified defendants' omission to disclose.

Plaintiffs called defendants as adverse witnesses. Defendants testified as such and not as expert witnesses. Nevertheless, defendants were medical experts, and their testimonies may properly be deemed to be expert medical testimony insofar as they disclosed the practice of competent and responsible medical practitioners in a particular medical situation. *Vigil* v. *Herman*, 102 Ariz. 31, 424 P.2d 159 (1967); *Sheffield* v. *Runner*, 163 Cal. App. 2d 48, 328 P.2d 828 (1958); *McPhee* v. *Bay City Samaritan Hospital*, 10 Mich. App. 567, 159 N.W.2d 880 (1968); *Wilson* v. *Scott*, 412 S.W.2d 299 (Tex. 1967).

In *Wilson* v. *Scott, supra*, the court treated the testimony which the defendant physician gave as adverse witness as expert medical testimony, and stated: "Dr. Wilson was called as an adverse witness, and by his own testimony he established the medical standard." So, also, in *McPhee* v. *Bay City Samaritan Hospital, supra*, it is stated that the defendant physicians' "own testimony was. for the purpose of this case, sufficient evidence tending to show the standard of care to be exercised."

We agree with those statements, and hold that defendants, by their testimonies, established the medical stand-

ard applicable to this case. The medical standard so established was that a competent and responsible medical practitioner would not disclose information which might induce an adverse psychosomatic reaction in a patient highly apprehensive of his condition.

Plaintiffs cited a number of cases, including *Salgo* v. *Leland Stanford Jr. University Board of Trustees, supra,* and *Natanson* v. *Kline, supra,* which state the general proposition that a physician violates his duty to his patient if he fails to disclose the risks and hazards of a proposed medical treatment. But they did not strenuously argue that the proposition applied to this case. They conceded that all of the cited cases recognized that in some situations it would be bad practice to make full disclosure to an unduly apprehensive patient.

Plaintiffs also cited *Johnston* v. *Rodis,* 251 F.2d 917 (D.C. Cir. 1958), and *Noel* v. *Proud,* 189 Kan. 6, 367 P.2d 61 (1961), which hold that a physician's statement that no danger is involved in the proposed procedure raises a question of warranty.

Here, Mrs. Nishi testified that she heard Dr. Hartwell say to her husband: "You have nothing to worry about, the procedure was going to take just a few minutes and when you get out of the anesthetic, you'll be just as good as new." It is admitted that Dr. Hartwell made some statement to the effect that the procedure was a fairly simple one, in the course of reassuring Dr. Nishi that everything was being done to locate the source of his pain, which he desperately wanted to know. Dr. Nishi did not consider Dr. Hartwell's statement to be a warranty, for he answered very definitely in the negative to the question whether defendants made any promises regarding the outcome of the procedure.

Plaintiffs' purpose in citing the *Johnston* and *Noel* cases was not to claim a warranty but to emphasize their

contention that Mrs. Nishi should have been told, if Dr. Nishi could not be told. This is clear from the following argument: "Thus, in the case at bar defendants' assertion that Dr. Nishi would be 'as good as new' placed upon him [sic] a correspondingly greater duty to inform Mrs. Nishi of risks and hazards."

There is a conflict in testimony as to whether Dr. Hartwell disclosed the collateral hazard to Mrs. Nishi. Dr. Hartwell testified that he did, for he considered it important for Mrs. Nishi to be fully informed. Mrs. Nishi testified that Dr. Hartwell did not. It is undisputed that Dr. Scully did not discuss the matter with Mrs. Nishi.

If defendants were legally obligated to disclose the collateral hazard to Mrs. Nishi, the conflict in testimony would have raised a jury question, and the dismissal of the action would be error. But, if defendants were not so obligated, the conflict would not be on a material issue of fact, and no jury question would have been raised.

We are of the opinion that defendants owed no duty of disclosure to Mrs. Nishi under the law. The duty of a physician to make full disclosure is one that arises from physician-patient relationship. It is owed to the patient himself and not to his spouse or any other member of his family.

If it should be the law that, if the patient could not be told, his spouse should be told, the necessary corollary of that requirement would be that the spouse could refuse her consent to the proposed treatment. A spouse has no such right, as is well stated in *State* v. *Housekeeper*, 70 Md. 162, 16 A. 382 (1889), where the patient requiring the treatment was the wife who was afflicted with cancer: "Surely the law does not authorize the husband to say to his wife: 'You shall die of the cancer; you cannot be cured, and a surgical operation, affording only temporary relief, will result in useless expense.' The husband had no power

to withhold from his wife the medical assistance which her case might require."

Plaintiffs equated the situation here to a situation involving a mentally incompetent person or a minor, where the consent of a person duly authorized to act for such person is required. The comparison is inapposite. Plaintiffs frankly admitted that they were unable to find any case precisely in point.

A mentally incompetent person or a minor has no legal capacity to act. That is why some person duly authorized to act must act for such person. In the case of a mentally incompetent person, the person duly authorized to act for him is his legal guardian. In the case of a minor, the duly authorized person is the minor's legal guardian or his parent, who is his natural guardian.

It is stated in *Barker* v. *Heaney*, 82 S.W. 2d 417 (Tex. Civ. App. 1935) : "It is true that a physician must secure the consent of the parent to operate upon a minor child, * * * but the wife is not the guardian of the husband and her consent is not necessary before a physician is authorized to perform an operation upon him."

Dr. Nishi was mentally competent and had the legal capacity to act. Mrs. Nishi was not his guardian.

It is true that a statement is frequently made that, in a situation where withholding of some information from a patient is called for by therapeutic considerations, full disclosure should be made to his spouse. But we are aware of no case which imposes a legal duty to do so upon the physician. *Lester* v. *Aetna Casualty & Surety Company*, 240 F.2d 676 (5th Cir. 1957), cited by plaintiffs, merely says that, if the wife's consent was required, the necessary consent had in fact been given in that case.

On this point, reference may be made to two law review articles written by Professor Hubert Winston Smith, a noted authority on legal medicine. The articles are:

"Antecedent Grounds of Liability in the Practice of Surgery," 14 Rocky Mt. L. Rev. 233 (1942), and "Therapeutic Privilege to Withhold Specific Diagnosis from Patient Sick with Serious or Fatal Illness," 19 Tenn. L. Rev. 349 (1946).

In the first article, Professor Smith stated: "The surgeon should always disclose the full facts to the immediate family and gain help in these dangerous and delicate cases from their knowledge of the patient's reaction patterns." 14 Rocky Mt. L. Rev. 249.

The statement in the second article is as follows: "There is another principle to be borne in mind from a legal point of view: in all such cases, the physician should make it a practice, wherever possible, to communicate the true facts immediately to near relatives. This will enable special arrangements to be made in respect to financial affairs, property matters or family dispositions, almost as effectually as if the individual himself knew the truth." 19 Tenn. L. Rev. 356.

Professor Smith's statements show the real reason underlying the injunction that a physician should make full disclosure to the patient's spouse, when disclosure could not be made to the patient. The reason is not that the law enjoins a physician to do so. It is that to apprise the patient's immediate family, not necessarily limited to the spouse, is a considerate act on the part of the physician to the spouse and the family; it is good public relations; and in some cases, the discussion which follows the disclosure will be helpful to the physician in deciding his course of action.

In the concluding paragraph of their brief, plaintiffs made a passing reference to the question of burden of proof, stating that "defendants themselves have failed at trial to justify their silence to the plaintiff and hence have

not carried the burden of showing that they did not fail in their duty to Dr. and Mrs. Nishi."

Plaintiffs' statement is presumably based on the current rule in Kansas, as stated in *Collins* v. *Meeker,* 198 Kan. 390, 424 P.2d 488 (1967). That rule is that where a physician fails to make any disclosure, he has the burden of establishing that the nondisclosure "did, in fact, conform, under the confronting conditions, to accepted professional standards," but, where disclosures are made, the plaintiff must establish by expert medical testimony that "the disclosures made did not accord to those which reasonable medical practitioners would divulge under the same or like circumstances."

It also appears that the physician bears the burden of justification in New Mexico, under *Woods* v. *Brumlop,* 71 N.M. 221, 377 P.2d 520 (1962). To our knowledge, in other jurisdictions, the burden is upon the plaintiff in all respects.

Be that as it may, we need not go into the respective merits of the prevailing rule and the minority rule at this time, for under our holding that their testimonies may be deemed to be expert medical testimony, defendants met their burden, even under the minority rule, of establishing that their omission to disclose did in fact conform to applicable medical standard.

Affirmed.

*Michael Shane* (*Hyman M. Greenstein,* on the brief, *Greenstein & Cowan* of counsel) for plaintiffs-appellants.

*John H. R. Plews* (*Thomas M. Waddoups* also on the brief, *Robertson, Castle & Anthony* of counsel) for defendants-appellees.

#### DISSENTING OPINION OF ABE, J.

As I see it, the sole issue of this case may be framed thus: where a patient suffers injuries as an after-effect of

thoracic aortography performed with his consent, such consent having been obtained without the disclosure of attendant collateral hazards, which party has the burden to prove that such non-disclosure was or was not according to reasonable standard of medical practice and therefore was or was not actionable?

This court recognizes the doctrine of informed consent and thereby imposes a duty on physicians to make full and complete disclosure of relevant information pertaining to proposed treatment or diagnostic procedure, including attendant collateral hazards. This doctrine is based on the concept that consent unless intelligently given is no consent, and that there can be no intelligent consent unless a patient is given reasonably full and complete information of the treatment or diagnostic procedure, as well as the collateral effects. *Salgo* v. *Leland Stanford Jr. University Board of Trustees,* 154 Cal. App. 2d 560, 317 P.2d 170 (1957); *Watson* v. *Clutts,* 262 N.C. 153, 136 S.E.2d 617 (1964).

This court on this issue says:

"In determining the question of physician's liability for nondisclosure, courts generally follow the rule applicable to medical malpractice actions predicated on alleged negligence in treatment which requires the question of negligence to be decided by reference to relevant medical standards and imposes on the plaintiff the burden of proving the applicable standard by expert medical testimony. *Shetter* v. *Rochelle,* 2 Ariz. App. 358, 409 P.2d 74 (1965); *De Filippo* v. *Preston,* 53 Del. 550, 173 A.2d 333 (1961); *Ditlow* v. *Kaplan,* 181 So. 2d 226 (Fla. App. 1965); *Grosjean* v. *Spencer,* 258 Iowa 685, 149 N.W.2d 139 (1960); *Roberts* v. *Young,* 369 Mich. 133, 119 N.W.2d 627 (1963); *Aiken* v. *Clary, supra* [396 S.W.2d 668 (1965)]; *Patterson* v. *Lynch,* 209 N.Y.S.2d 244 (1969); *Anderson* v. *Hooker,* 420

S.W.2d 235 (Tex. Civ. App. 1967); *Govin* v. *Hunter, supra,* [374 P.2d 421 (Wyo. 1963)]."

And concludes: "[t]hus, we treat this case as a negligence action. *The right of a plaintiff to relief does not depend upon his allegations or his theory of the case.*" (Emphasis supplied.) I agree with the emphasized portion of the statement. However, I do not believe that where the plaintiffs, as in this case, have alleged battery as a sole ground for claim of relief and have tried the case under the theory, this court can rightfully and justifiably hold that the plaintiffs claim for relief should be decided on technical elements of the negligence theory to their prejudice. Therefore, I dissent.

## I.

If the decision of this court is that all claims for relief under the doctrine of informed consent shall be tried under the negligence theory, I question the soundness of such holding. It appears to me that the only difference in the trial of such action under the battery theory and the negligence theory is as follows: (a) under the battery theory a physician must prove that withholding the information was justified under reasonable standard of medical practice; and (b) under the negligence theory a patient must prove it was negligent under established standard of medical practice for a physician to have withheld the information.

I am not convinced that this case should have been tried only under the negligence theory. Of course, as pointed out by this court, in other jurisdictions actions involving informed consent have been treated as medical malpractice cases and then classified as negligence actions; but reasons given for such classification are not convincing. Professor Prosser says that where a physician has failed to make full disclosure, most of the courts have treated the

issue as one of negligence and says that treating such a claim of relief on the negligence theory is preferable "in the light of the possible highly undesirable effects upon some patients of disclosure of some medical or surgical risks."[1] Is this reason legitimate? I don't think so because even under the theory of battery, a physician may justify his nondisclosure when it is for the best interest of a patient not to do so under reasonable standard of medical practice.

Fundamentally, the claim for relief under the doctrine of informed consent is founded on the theory of battery. And as I have noted above, this doctrine is based on the concept that consent unless intelligently given is not a consent, and thus, consent obtained by fraud or without reasonable disclosure is void—a nullity. In other words, fraud or misrepresentation or failure on the part of a doctor to reasonably inform a patient[2] vitiates the consent that he may have obtained from a patient and, therefore, whatever was done by a doctor, even with the utmost skill, is battery and a patient would have a claim for relief. Thus, it is no defense for a doctor that the treatment or diagnostic procedure was conducted with utmost skill, because the claim for relief is not the unskillful nor negligent act of a physician, but the unconsented touching of a patient which is battery.[3]

The plaintiffs correctly tried this case under this theory. The evidence is uncontradicted that Dr. Hartwell and Dr. Scully failed to fully disclose to the patient the collateral hazards of the injection of Urokon in the diagnostic procedure of thoracic aortography. Thereby, I believe, the

---

[1] Prosser, Torts § 18 at 107 (3d ed. 1964).

[2] Of course subject to justification for non-disclosure under reasonable standard of medical practice.

[3] Unless the consent is vitiated, in my opinion, there will be no basis for a claim of relief. Assuming that a doctor was negligent for his failure to reasonably disclose the hazards, under the negligence theory what is the basis for claim of relief where treatment or operation was performed with reasonable skill?

plaintiffs had proven a prima facie case of battery and liability on the part of the doctors. The burden was not on the plaintiffs to show that under reasonable standard of medical practice the doctors should have been required to make full disclosure.

Because the consent to conduct thoracic aortography had not been obtained after full disclosure, it was for Dr. Hartwell and Dr. Scully to show why they should not be liable for battery. It appears that their defenses were:

(1) That the attendant collateral hazards of paralysis as an aftermath of the injection of Urokon was minimal, and therefore under medical standards they were under no duty to advise Dr. Nishi of that danger; and

(2) That because of Dr. Nishi's psychological condition, they did not disclose the attendant hazards for the best medical interest of Dr. Nishi.

Assuming, arguendo, the validity of such defenses, they were affirmative defenses in a nature of confession and avoidance, and the burden of proof was with the physicians. They had the burden to show by expert medical testimony, that the diagnostic procedure of thoracic aortography conducted by the injection of Urokon into the bloodstream would not as an aftereffect bring about paralysis, or that such hazard was so minimal that they were under no duty to inform Dr. Nishi of the attendant hazardous effect. Or that by reasonable standard of medical practice it would have been for the best interest of Dr. Nishi not to inform him of the hazardous aftereffect of the injection of toxic Urokon in the performance of thoracic aortography.

Here, there was no such standard established, nor was there an attempt to do so because the trial judge dismissed the case after the plaintiffs rested, though they had proven a prima facie case. The dismissal was based on an erroneous theory that the plaintiffs had the burden to prove

that under reasonable standard of medical practice, Dr. Hartwell and Dr. Scully were under a duty to make reasonable disclosure to Dr. Nishi. As I have noted above that was not the case, and the plaintiffs by showing that Dr. Hartwell and Dr. Scully failed to reasonably inform Dr. Nishi, had proven a prima facie case for recovery against and liability on the part of Dr. Hartwell and Dr. Scully.

However, the trial court first and this court now arbitrarily make a choice for the plaintiffs as to the theory of this case, which is contrary to their choice and action taken in the trial pursuant thereto, and with the making of this selection figuratively kick them out of court.

Thus, if it is the intention of this court to adopt a policy to require all cases of informed consent to be tried under the negligence theory, unless it gives the plaintiffs an opportunity to retry this case in the trial court under the negligence theory, I believe it would be a denial of justice.

## II.

This court further attempts to justify the action of the trial judge in directing a verdict for the defendant-doctors with the statement that "[t]he only medical standard established here justified defendants' omission to disclosure." And that

"Plaintiffs called defendants as adverse witnesses. Defendants testified as such and not as expert witnesses. Nevertheless, defendants were medical experts, and their testimonies may properly be deemed to be expert medical testimony insofar as they disclosed the practice of competent and responsible medical practitioners in a particular medical situation."

This court in following *Wilson* v. *Scott*, 412 S.W.2d 299 (Tex. 1967), is making bad law. Both Dr. Hartwell

and Dr. Scully, who had taken the stand as adverse witnesses, were giving self-serving testimony to justify their action and non-action. Now this court says their testimony may be used to establish reasonable standard of medical practice. In other words, a doctor can tell the jury and decide for the jury that he is not liable because of his say so. I rue this day where it has been recognized that one can exonerate himself of liability on his say so. I believe such self-serving testimony should not be used to establish the relevant standard of medical practice. Here their testimony was to show what they did or failed to do and the reasons for their action or non-action. Testimony of other disinterested physicians should be required to establish the reasonable standard of medical practice on these questions so that the conduct of Dr. Hartwell and Dr. Scully may be measured against such standard by the jury to determine whether under the established standard Dr. Hartwell and Dr. Scully were justified in conducting the diagnostic examination on the consent of Dr. Nishi, which was not based on reasonable disclosure. This determination should be made by the jury and not the defendant-doctors.

### III.

Further, if the decision of this court means that all cases under the doctrine of informed consent shall be tried under the negligence theory, it may amount to nullification of all such claims because it may be almost impossible, if not absolutely impossible in many cases, to prove damages under the generally recognized rule of proximate cause.

Now let us assume that in this case it was proven that under established standard of medical practice Dr. Hartwell and Dr. Scully should have made full disclosure of the collateral hazards attendant, and therefore, their

failure to do so was negligence. Now, will they be liable for damages to Dr. Nishi for the injuries he suffered because of this negligence? Not under the generally recognized rule of proximate cause because the injuries he suffered were not the proximate result of the negligence of the physicians—their failure to make full disclosure. The injuries were the result of the injection of Urokon into his bloodstream and its aftereffect.

In discussing the causal relationship and damages in cases under the informed consent doctrine, Professor Marcus L. Plante[4] says:

"The essence of the legal wrong to plaintiff in a battery case is the touching itself which, standing alone, entitles him to substantial damages. Thus the issues of causation and damages are simple."

On the other hand he states:

"In medical negligence cases, however, the issue of causation is more complex in theory and practice. Plaintiff must show that if he had been fully advised as to the collateral risk he would not have submitted to the procedure. This is a sort of 'but for' rule. There must be a cause-in-fact relationship between plaintiff's ignorance of the risk and his willingness to go forward with the operation. The converse is also true, i.e., if it appears that plaintiff knew of the risk all the time, the failure of the physician to disclose it would have no causal connection with the injury."

\*　　\*　　\*　　\*　　\*

"How is this causal relationship to be proved? It may not be difficult. All that plaintiff may need to do is testify that he would not have permitted the operation if he had known the risk; then, unless his veracity is impeached, or his assertion is inherently incredible

---

4 An Analysis of "Informed Consent," 36 Fordham Law Review, 639, 666-667 (1968).

(e.g., because of the slight danger involved), or there is proof that he actually knew of the danger all along, he would at least make an issue for the jury."

It appears to me that the "but for" rule is inconsistent with the generally recognized rule of proximate cause. Under the "but for" rule one can be held responsible for all natural consequences of his act. To cite a ridiculous example where a person is injured it may be argued "but for" his getting up in the morning he wouldn't have been injured.

As I have stated above the injuries suffered in most cases would not be the proximate result of a physician's failure to make full disclosure to a patient. Is this court adopting the "but for" rule in cases under the doctrine of informed consent? Or is the rule of proximate cause to be substituted by the "but for" rule in all negligence cases?

Here, Dr. Nishi in his deposition stated that he would not have consented to undergo thoracic aortography if he had been fully informed of the collateral hazards attendant and thus, the plaintiffs would have been able to prove damages under the "but for" rule. However, how is a plaintiff, who sues a physician in a representative capacity for a deceased person, to show causal relation even under the "but for" rule where the patient dies during a surgery or immediately thereafter before he learns of the nondisclosure?

Also to require a patient-plaintiff to show that his mental and emotional condition at the time of the treatment or prior thereto did not justify a physician from withholding certain information, I believe, would be placing almost an insurmountable burden of proof upon a plaintiff. In many cases a patient may have had one family doctor and he alone would have the specific knowledge regarding plaintiff's condition that would justify non-disclosure.

I believe logic and reason dictate that courts should permit the trial of cases involving informed consent under the battery theory for the reasons I have stated above, unless the basic ground for requiring such cases to be tried only under the negligence theory is to discourage such actions by making proof difficult for patients.

## IV.

If the reason for requiring this case to be tried under the negligence theory is not to shift the burden of proof as to the justification for the physicians' failure to make full disclosure, even under the negligence theory the burden of proof on that question should be placed upon the physicians.

It is general knowledge that a doctor dislikes to testify against his fellow doctor.[5] Thus as a general policy, wherever possible, courts should not overly burden a patient-plaintiff by requiring him to prove his case against a physician by the testimony of other physicians. Therefore, in the trial of this case, even under the negligence theory, the burden of proof on the issue of nondisclosure should be on the physicians and they should be required to prove by testimony of disinterested expert witness that under established standard of medical practice they were justified in not fully disclosing to Dr. Nishi of the collateral hazards attendant.

Thus to overcome the difficulties of proof, this court should, as a matter of law, create a presumption that where a patient's consent to the operation or treatment has been obtained without reasonable disclosure there has

---

[5] In *Agnew* v. *Parks*, 172 Cal. App. 2d 756, 763, 343 P.2d 118, 123 (1959), where a patient sued a group of doctors for "conspiracy to obstruct the ends of justice" for their refusal to testify, the court calls this reluctancy of doctors to testify "conspiracy of silence."

been a deviation from established standard of medical practice and impose upon a physician the onus of coming forward with justification of his conduct by the use of qualified medical evidence.[6]

This court has indicated its willingness to pioneer new case laws to bring about justice and fairness and to meet the needs of changing time.[7] However, it appears that here this court is backing away from this policy. Yes, this court by its decision recognizes a claim of relief under the doctrine of informed consent, but by the same decision it also nullifies this claim by making it almost impossible, if not absolutely impossible for a patient to prove such claim and damages. Also, if all cases for informed consent are to be tried under the negligence theory, what rule of causation is to be applicable?

I would reverse and remand for a new trial.

---

[6] Professor Allan H. McCoid made such a suggestion on the issue where a patient had not given express consent to the operation or treatment. A Reappraisal of Liability for Unauthorized Medical Treatment, 41 Minn. L. Rev., 381, 434 (1957).

[7] Yoshizaki v. Hilo Hospital, 50 Haw. 150, 433 P.2d 220 (1967) ; Lemle v. Breeden, 51 Haw. 426, 462 P.2d 470 (1969) ; Pickard v. City & County, 51 Haw. 134, 452 P.2d 445 (1969), Tamashiro v. De Gama, 51 Haw. 74, 450 P.2d 998 (1969) ; Fergerstrom v. Hawaiian Ocean View Estates, 50 Haw. 374, 441 P.2d 141 (1968) ; Rodrigues v. State, 52 Haw. 156, 472 P.2d 509 (1970).