IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 8, 2004 Session

## DARRELL MASSINGALE v. YUNG GIL LEE, P.C., ET AL.

**Appeal from the Circuit Court for McMinn County**
**No. 23820     John B. Hagler, Judge**

———————————

**No. E2004-01364-COA-R3-CV - FILED APRIL 28, 2005**

———————————

During surgery to repair a bilateral hernia, Yung Gil Lee, M.D. ("Defendant") also performed an orchiectomy and removed Darrell Massingale's ("Plaintiff") left testicle. Plaintiff sued Defendant claiming, in part, that Defendant had committed both medical malpractice and medical battery. The Trial Court granted Defendant's motion for a directed verdict on the claim of medical battery. The claim of medical malpractice went to the jury and resulted in a mistrial. The Trial Court then reconsidered Defendant's motion for a directed verdict on the claim of medical malpractice and entered an order granting a directed verdict on that claim as well and dismissing the case. Plaintiff appeals claiming that the Trial Court erred in directing a verdict as to both the medical battery claim and the medical malpractice claim. We affirm the directed verdict on the medical malpractice claim, reverse the directed verdict on the medical battery claim, and remand for a new trial on Plaintiff's medical battery claim.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed, in part, Reversed, in part; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Dan Channing Stanley, Knoxville, Tennessee, for the Appellant, Darrell Massingale.

Sharel V. Hooper and Timothy J. Millirons, Chattanooga, Tennessee, for the Appellees, Yung Gil Lee, P.C. and Yung Gil Lee, M.D.

# OPINION

## Background

Given the nature of the issues raised on appeal, a detailed discussion of the evidence presented to the jury is necessary. This is particularly so given the extensive expert testimony presented to the jury in this medical malpractice and medical battery case as the issues on appeal relate to whether the Trial Court erred in granting directed verdicts as to both of these claims.

On October 14, 1999, Defendant performed surgery on Plaintiff to repair a bilateral inguinal hernia. During that surgery, Defendant performed an orchiectomy and removed Plaintiff's left testicle. Post-surgery, Plaintiff developed lymphedema and a recurrent hernia on the right side. Plaintiff underwent several subsequent surgeries to repair the recurrent hernia and to reduce swelling of the scrotum. Plaintiff sued Defendant claiming, in part, that "the inadequate hernia repair caused the massive scrotal swelling, as well as other unusual complications" and that the removal of the left testicle was unnecessary, done without proper consent, and negligent.

Plaintiff filed a motion for partial summary judgment claiming, in part, that Defendant was liable for medical battery for removing Plaintiff's left testicle as Plaintiff was not aware the testicle would be removed, did not consent to such removal, and Plaintiff's condition did not constitute an emergency situation necessitating the removal of the testicle. The Trial Court entered an order on September 16, 2002, holding that a genuine issue of material fact existed as to this issue and denying Plaintiff's motion for partial summary judgment. The case was tried to a jury in August of 2003.

Plaintiff testified at trial that he first learned he had a hernia in 1997. Plaintiff stated that the condition wasn't that bad, but would come and go and that he was able to continue working. Plaintiff decided in 1999 to undergo surgery to correct the hernia. Plaintiff testified that he asked Defendant prior to the surgery if it would "affect me in any way in my manhood or anything happen down there that I should need to know about." Plaintiff testified that Defendant told him it was minor surgery and he didn't have anything to worry about.

Plaintiff signed a consent form prior to surgery. In pertinent part, the consent form stated:

> I consent to the performance of operations and procedures in addition to or different from those contemplated, whether or not arising from presently unforseen conditions, which the above name physician or his associates or assistants may consider necessary or advisable in the course of the operation.

Plaintiff testified that he was given an epidural and was awake during the surgery. He stated that after the surgery "I went home, and it was like a big basketball between my legs." Plaintiff testified that he could not get his clothes on after the surgery.

In November of 1999, approximately one month after the surgery, Plaintiff went to see Frederick A. Klein, M.D., the chief of urology at University of Tennessee Medical Center, complaining of a very large scrotum. Dr. Klein testified that "[i]t's relatively common to have temporary swelling following almost any kind of surgery, especially hernia surgery," but it usually goes away in a couple of weeks. Plaintiff also developed a recurrent hernia on the right side.

Dr. Klein performed surgery on Plaintiff to repair the recurrent hernia and reduce the scrotal swelling. In total, Plaintiff underwent three surgeries after the surgery performed by Defendant on Plaintiff. Plaintiff testified that after the first of these three surgeries, he had some swelling but that it wasn't bad and he was still able to get his clothes on. Plaintiff admitted that he had swelling after each of the subsequent surgeries. The evidence shows that once lymphedema develops, the way to get rid of it is to excise the tissue.

James W. Taylor, M.D., a plastic and reconstructive surgeon, assisted Dr. Klein during Plaintiff's first subsequent surgery. Dr. Taylor testified that this was a difficult surgery. Dr. Taylor explained that Plaintiff had massive scrotal edema or swelling, a large inguinal hernia, and a penis buried in fat and tissue. Dr. Taylor testified that they resected a "heavy amount of tissue," around 12 to 25 pounds, from Plaintiff's scrotum during that surgery.

Defendant testified at trial regarding the surgery at issue in this case and his treatment of Plaintiff in general. He explained that in addition to the bilateral inguinal hernia surgery at issue, he had performed a ventral hernia repair on Plaintiff in June of 1999. Plaintiff did not suffer a recurrence of the ventral hernia.

As to the surgery at issue, Defendant testified that if a patient's condition permits, then a bilateral repair is appropriate. He further testified that Plaintiff's bilateral inguinal hernia was the largest hernia he has seen. Defendant explained that with any surgery, you expect four to six weeks of swelling.

Defendant testified he did not inform Plaintiff prior to surgery that he might lose a testicle because that was not an anticipated risk of this surgery. Defendant admitted that the removal of the testicle was not an emergency situation, but stated he does not believe it is serious to remove one testicle. He testified that in most patients, when one testicle is removed, the other takes over and compensates.

Defendant testified regarding his decision to remove Plaintiff's testicle. Defendant explained that in most cases the omentum, or fat in the hernia sac, and the spermatic cord are completely separate, but in Plaintiff's case inflammation made it impossible to separate them. Defendant testified that the omentum and the spermatic cord in Plaintiff's case "was glued together,

I mean glued, just inseparable." Defendant stated that Plaintiff's left testicle "[e]ither wasn't functioning or even functioning probably very low function." Defendant testified he could tell by the appearance that the blood was not circulating in the testicle and some of that fat removed was necrotic and "[t]hat means that there is much inflammation around the spermatic cord." Defendant stated: "Is nearly 100 percent he's probably - - his blood vessel circulation was damaged and either he develop, we call it gangrene or abscess on that testicle. That means we have to go back, remove that, even make it worse on the hernia repair."

Defendant testified that sometimes you find something unusual during surgery that you weren't prepared for and you know you will have to go back for surgery again. He stated:

Sometimes you feel uncomfortable and feel you need more information, you just have to stop and come back later on. For example, like the right side, the reason why I only sacrifice left testicle, I don't want to sacrifice on the right side if I can. This is one. Second one, his ureter, like I said, this is the first time. Ureter is all sliding through the hernia, which is extremely unusual. I never heard about it. I need information because the ureter is a touchy - - I was concerned about having some blockage, and so I needed more information before taking into surgery, so I just close the surgery. I fix him all I can, left a small weakening area. There is nothing wrong with that. I mean, if we do the rest, I have to sacrifice almost the other testicle.

The operative report for the surgery at issue states: "Both inguinal walls were completely attenuated. . . . No strong fascia or ligament was available because of the longstanding hernia." Defendant explained that attenuated means the fascia, or tissue, was thin. Defendant testified that whenever a hernia occurs it is because the walls are weak already. Defendant testified that he sometimes uses mesh, if the tissues are weak, but that he did not use mesh during the surgery at issue.

Defendant testified regarding his decision to not use mesh stating:

The mesh gauze is not benign. This is a foreign material. You have a high risk for infection. Second of all, this make it stiff all the time. Some people just don't like it. Every time you move a leg, it is aching like - - almost like a . . . . And also is sharp area, sometimes pinch nerves. You might have more nerve pressure on the pain on groin area after surgery, so this is all kind of - - it's not benign. A lot of problems there, so you have to use it very carefully, not use in every hernia, only when you cannot repair. If you cannot make a tight repair, then you have to use them, not the routine.

Defendant also stated:

I feel like some day or somebody have to come back to repair again. If so, when you leave mesh gauze is going to be big mess, not only twice as hard dissecting, you have

more chance to damage the tissues, more bleeding problems and the potential when you tear up all the mesh gauze you make a big defect, make a lot weaker, so make everything complicated. So for me, my best judgment is not use it, leave it alone, repair as best I can.

Roy Lawrence Kroovand, M.D., a retired pediatric adolescent reconstructive urologist, testified as an expert witness for Plaintiff. Dr. Kroovand testified that his practice was approximately 90 percent pediatric and 10 percent adult reconstructive. Dr. Kroovand explained that he moved in 1986 to a hospital where he was the only urology faculty member with any experience in adult reconstructive urology, and so he was given very complicated procedures that other faculty members were unable to do and, as a result, he developed a reconstructive practice.

Dr. Kroovand opined that Defendant breached the standard of care in several ways. He opined that it fell below the standard of care to attempt to repair both hernias during the same surgery, as Defendant did in this case. Dr. Kroovand also opined that Defendant did not have informed consent to remove the testicle. He stated that there are "times when you find things that you don't expect to find, and in that situation, if it's not life threatening, you need to get informed consent from someone."

Dr. Kroovand explained that the testicle has two primary functions, to produce testosterone, and to form sperm. Dr. Kroovand testified that tests done on Plaintiff after the surgery at issue in this case show that Plaintiff's testosterone level is 92, while the normal range is 241 to 827. Dr. Kroovand stated Plaintiff is "severely testosterone deficient." However, the evidence shows that no tests of testosterone level were done on Plaintiff prior to the surgery at issue so there is no way to know whether, or to what extent, the surgery at issue effected Plaintiff's testosterone level. Dr. Kroovand admitted that losing one testicle does not make a person sterile.

Dr. Kroovand further opined that it was a breach of the standard of care for Defendant not to use mesh when repairing the hernia. He stated:

The standard of care, in my judgment, and I think in the judgment of most people, is if you have thin tissue, tissue that is not strong enough to hold sutures and hold together to prevent the hernia from recurring, you have to use something to supplement that, and I use a mesh graft called Marlex. . . . Marlex has been for years - - I think it was the original mesh graft, and for years it has been the standard of care.

Dr. Kroovand opined that the failure to use mesh on the right side and the recurrence of the hernia on that side caused the lymphedema. However, Dr. Kroovand agreed that some surgeons use mesh and some don't and that there are risks associated with the use of mesh, including infection. When asked whether going back into an area where mesh had been used previously would be difficult because the foreign body of the mesh had become incorporated, Dr. Kroovand replied, "It's a disaster."

Dr. Kroovand testified that "with inguinal hernia repair, whether it's a pediatric patient or an adult, there may be some temporary irritation to the lymphatic drainage, which will produce temporary scrotal swelling, but generally it is not bad." Dr. Kroovand admitted that he could not say with 100% certainty that the recurrent hernia on the right side was the predominant cause of the lymphedema, but stated he believes that it was the probable cause. He stated: "I don't think anyone can point out absolutely what the lymphedema was due to. There's certainly positive relationships." He explained further stating:

> I think the recurrent hernia on the right side was a proximate cause of the lymphedema. It may not have been the total cause. It was certainly high on the list of causes. . . . I cannot say that it was the only cause. That then takes me from being absolute and only into it must be contributory. Now, was it 90 percent contributory, 20 percent contributory, I don't know.

Dr. Kroovand did state that the hernia repair on the left side had no relation to the lymphedema.

Dr. Kroovand explained that he believes the recurrent right hernia contributed to the lymphedema

> because the size of the reoccurrence . . . was such that the entire scrotal compartment on the right side was filled with what subsequently turned out to be intestine, the ureter from the right kidney, which was almost a foot down into this area, and omentum. This produced the pressure on the lymphatic drainage from the right side and possibly influenced the left side, also, such that the normally formed lymph fluid could not drain into the lymph nodes and be reprocessed back into the bloodstream. With this tissue being filled with fluid, it is going to swell and it is going to become very thick and almost leather-like.

Dr. Kroovand admitted it is possible that the lymphedema was related to Plaintiff's obesity. He explained that:

> omentum is a fatty tissue which drapes down off of the intestine that's used something like a filter to pick up things that you want to filter out. It has lymph nodes in it. In some people who are extremely overweight, the omentum becomes very, very large and very problematic. . . . [W]hen a hernia occurs, a simple hernia with just a little bit of intestine sticking down through it, but not big like that, will enlarge the external ring. And with a larger hernia, obviously this becomes larger and larger, and that's what you have there. With all of this being down there, you will have some constriction of the enlarged external ring. The more tissue down in there - - the ring can only stretch so far, and the more compression you have, then the higher the risk of having intestinal injury and compromised blood supply, having lymphedema because of a collection of fluid in the tissue down here, because the fluid forms all the time, and with this being obstructed, or partially obstructed, it can't drain completely, so it swells.

William E. Kennedy, M.D., an orthopedic surgeon who currently limits his practice to doing independent medical examinations, also testified as an expert witness for Plaintiff. Dr. Kennedy examined Plaintiff and determined that Plaintiff "suffered 42 percent permanent physical impairment to the whole person as a result of the combination of a urethral disorder, the inability to perform sexually, and also partial loss of his scrotum and also the loss of his left testicle." Dr. Kennedy opined that he believes Plaintiff will have this percentage of impairment for the remainder of his life. Dr. Kennedy testified that Plaintiff weighed 353 pounds when he came to see him. Dr. Kennedy did not perform any specific tests on Plaintiff, but noted that Plaintiff's "penis was still largely buried and surrounded with enlarged and edematous . . . tissue that would make it difficult for him to perform in a normal sexual manner." Dr. Kennedy explained that "[e]dema is increased fluid accumulation, and, therefore, enlargement of the soft tissue." Dr. Kennedy opined:

there was causal relationship between what I found and what was documented in the record on the surgery. . . . The findings of record, as well as my own findings, followed the known and well-established pathophysiological patterns that we generally expect following the type of surgery that [Plaintiff] underwent on October 14th, 1999 and also following the necessity of the subsequent scrotoplasties.

Dr. Kennedy recommended:

[that Plaintiff's] future activities of daily living and employment not require repeated bending, stooping or squatting, vigorous pushing or pulling, working over rough terrain or in rough vehicles, excessive ladder climbing or stair climbing or working with his hands raised above the level of his shoulders. Ideally, he should be able to control his posture with respect to sitting or standing. Sitting should not exceed 45 minutes at a time for a maximum of about 3/4 of a workday. Standing and walking should not exceed 15 minutes at a time for or (sic) a maximum of about 1/4 of a workday. Maximum lifting should be no greater than about 20 pounds occasionally, meaning less than 1/3 of the time, or 7 pounds frequently, meaning up to 2/3 of the time, assuming a level lift, that is, assuming that he doesn't have to bend and twist or stoop or squat in the process of doing the lifting.

Dr. Kennedy also opined:

[that the] massive edema and enlargement of the scrotum caused the urethral disorder, the difficulty in voiding. The absence of a testicle, of course, contributed a great deal to the inability to have normal sexual function, along with the massive edema of the scrotum and enlargement of the scrotum and the associated tissues even above the scrotum extending into the lower abdomen and into both groins, and all of that, I concluded, more likely than not, had been caused by the surgery of October 14th, 1999.

Dr. Kennedy was questioned regarding discrepancies in his testimony. Specifically, when he was asked during his deposition if he could say which procedure caused the complaints, he replied that he could not. At trial, he stated:

> It does appear that I have a different opinion today about that. And in further reviewing this case in preparation for this deposition, all I can say is that it appears clearer to me than it apparently did at the time of this discovery deposition, which was taken just a month ago; and I apologize for that, but that certainly is a discrepancy between the two depositions.

Julian M. Nadolsky, Ed.D., a counselor with a doctoral degree in counselor education, also testified as an expert witness for Plaintiff. Dr. Nadolsky testified he has "a small company called The Rehabilitation and Wellness Corporation, which is concerned with vocational services." Dr. Nadolsky met with Plaintiff in October of 2001. He interviewed Plaintiff, gave him tests of general intelligence, basic reading, and arithmetic ability, and reviewed Plaintiff's medical records. Dr. Nadolsky then prepared a vocational analysis report. Dr. Nadolsky testified that Plaintiff scored in the below average range on the general intelligence test, the reading test, and the arithmetic test. He opined that Plaintiff has "lost access to about 96 percent of the jobs in this local labor market that he could have performed prior to developing the problems as a result of the bilateral inguinal hernia surgery that was undertaken on October 14th of 1999." Dr. Nadolsky testified that he based his opinion, in part, on Dr. Kennedy's restrictions and stated: "I think it is very unlikely that [Plaintiff] would be able to perform the day-to-day duties of any occupation on a regular sustained basis. I think realistically he's 100 percent disabled for employment, and I think he'll remain 100 percent disabled for employment." Dr. Nadolsky testified that he based his analysis on a 12 county area that did not include Hamilton County or Knox County.

Walter B. Rose, M.D., a general surgeon, testified as an expert witness for Defendant. Dr. Rose opined that Defendant did nothing wrong during the surgery and stated: "In fact, I think under the circumstances he did a lot of things right." Dr. Rose testified that "there is no standard way to fix a hernia. There's some basic principles, but no standard way." He stated that "[t]he goal of hernia surgery is to fix the defect in a safe, efficient way and hopefully a permanent fix without causing any undue stress or damage to the person during the course of the anesthesia and surgery." Dr. Rose testified that "there's no way to guarantee that a hernia will never come back regardless of any technique that one wants to utilize or think of." When asked about performing operations on both sides at the same time, Dr. Rose replied "there's no standard. The vast majority of surgeons including myself fix hernias on both sides, bilateral hernias at the same setting."

Dr. Rose explained that "[t]he basic hernia defect is a weakness in a muscle wall. It can be in any muscle wall, the diaphragm, hiatal hernia." Dr. Rose testified that

> sometimes a hernia that's stuck in the - - through the defect can get twisted or kinked and the blood supply to whatever the herniated material is regardless of what it's made up of can be compromised and when the blood supply is compromised, we call that ischemia, which is poor blood supply of the tissue. And if tissue remains

ischemic long enough, then it dies and then goes necrosis. . . . So the biggest danger is tissue loss, tissue death.

Dr. Rose opined that Defendant did not breach the standard of care by choosing not to use mesh. He stated: "There is no standard to use mesh or not use mesh." Dr. Rose testified that he prefers to use mesh, but stated: "A huge area of controversy in surgery is do you use mesh or you do not use mesh." Dr. Rose further explained:

I have had to go back in on recurrent hernias where there have been mesh and it is extremely difficult actually by design. Part of the mesh repair, the mesh itself is strong and that's a good thing. Another part of the repair is the mesh engenders a severe inflammatory response from the body because it's a foreign body and it's not an allergic response. It's not a rejection response. It's just a healing response. . . . The mesh doesn't dissolve. It's that polypropylene plastic, but it engenders this incredible inflammatory response and scarring and I have taken hours sometimes to remove, revise mesh, not just in the groin area, but other parts of the body where we use mesh also. So no surgeon wants to go back in on a mesh hernia repair.

Dr. Rose admitted that when you use mesh you have only a one-half percent chance of recurrence and stated that if he had done the surgery on Plaintiff, he would have used mesh on both sides because that is his routine. However, he stressed, there is no standard about using mesh. Some surgeons never use it and some always use it.

Dr. Rose testified that he, in his ten years of private practice and five years of surgical residency, has had to perform an orchiectomy while doing a hernia repair five or six times. In those cases, the orchiectomy was not listed on the consent form because it is

not part of the intended conduct of the operation to remove the testicle. Because in cases where I've had to remove it and most general surgeons that find themselves, we're not talking about removing the testicle because it's malignant or a problem like that that you would know about before the surgery. The problem and the decision-making process arises during the conduct of the operation. To do the operation properly, to do the operation appropriately, the surgeon sometimes has to make that decision.

Dr. Rose explained that:

compromise to the blood supply causes tissue death and so if the blood supply to the testicle would be compromised during the course of an operation, the testicle would essentially die and it could cause some complications of chronic pain. It could cause infectious complications by leaving unhealthy tissue in a surgical site. And it could actually cause some scarring if one left it behind, chronic scarring in a hard firm area that would be uncomfortable for the patient.

Dr. Rose testified that it would not be advisable to wake a patient up and then go back the next day or next week in the same area. He stated:

> I can't think of really any circumstance of waking a patient up and going back in a day or a week unless the patient was actually having problems from the anesthesia and was in danger of dying on the operating table. I can't really think of any circumstance in a hernia repair of this nature where one would stop the operation, wake the patient up and go back. It's actually counterproductive and a higher risk to go back later. You've got the anesthetic complications all over again. You've got the very upset, angry, irritated tissue that one has already dissected through, for example, that's more prone to infection.

Dr. Rose testified that Plaintiff's pathology report shows "that the testicle seemed to have had some compromise of thrombosis in the blood supply to the veins of the testicle." Dr. Rose testified that there was a huge amount of omentum or adipose tissue removed. Fat necrosis and constipation also were noted in the final diagnosis as the omentum had undergone some necrosis or tissue death and calcification. Dr. Rose explained that

> [c]alcification occurs in tissue that's undergone death and attempted at healing and actually calcium deposits just like the calcium in your teeth or bones kind of migrates into this tissue and so sometimes you'll have . . . areas of calcification and it often occurs with fatty tissue death and it's not something that's a short-term issue.

Dr. Rose opined that Defendant did not breach the standard of care when he removed the testicle

> because a reasonable surgeon, well-trained is almost compelled to do what needs to be done at the time of an operation if one finds oneself in a situation where it's in the best interest of the patient to remove tissue or structures that would endanger the patient down the road.

Dr. Rose explained that

> in the normal male, loss of one testicle would not be noticed particularly in terms of the spermatogenesis, which is making the sperm, or in the hormonal production because two testicles are more than one needs to take care of these processes in the body. So in the normal male, the body wouldn't really need to compensate, but the right testicle in this case would take up and keep producing the testosterone and the sperm.

When asked whether Defendant could have stopped the operation before removing the testicle and closed up, Dr. Rose replied:

-10-

the point of where he had to do the removal of the testicle, just the sheer visualization and dissection necessary to define the hernia and the extent and the tissues involved, the testicle is already compromised. So if he had stopped the operation at that time and closed up and left dead tissue behind, that would have been, you know, a worse outcome that (sic) removing the testicle.

Dr. Rose further explained:

In this situation, by the time the testicle is exposed and identified and all the tissue dissected off of it to see the nature of the problem, it had already been compromised because of the adherent tissue on it in the process of peeling it off, perhaps also some of the stretching from the weight of the massive omental tissue. At that point when you even have an idea to diagnose the exact nature of the problem, it's already beyond the point of where you could close up because you were worried about damage or worried about its integrity. You've already gotten to that point.

Dr. Rose also testified regarding the swelling that Plaintiff experienced stating:

there's a lot of swelling that accompanies hernias.

The tissue down there is very loose. It's very flimsy. It's like a sponge. Just from the act of surgery and dividing these layers I've discussed earlier, you're going to get a lot of swelling. . . . [T]hat's called edema. That generally subsides over that six to eight-week period.

Dr. Rose opined that Plaintiff would have developed lymphedema no matter who performed the surgery. He further opined that the recurrent hernia on the right did not cause Plaintiff's lymphedema and stated that the use of "mesh has no bearing on lymphedema development." Dr. Rose stated that "[t]here's very few things that will cause this degree of lymphedema and the very few things would be division of the lymphatic channels, infiltration of the lymphatic channels by malignancy." Dr. Rose opined that the incisions did not cause the lymphedema, but stated he believes that Plaintiff was "in a compensated state on the verge of lymphedema."

Dr. Rose testified that chronic lymphedema or chronic swelling is "very unpredictable" and there is no way to tell pre-surgery if a patient will have this problem. He stated that

sometimes one event, an illness, injury, surgery will actually bring out an underlying condition that was heretofore not really diagnosed or diagnosable. . . . Our body has an incredible ability to compensate for problems. . . . But by the time physicians or the individual knows about an illness, frequently the person has compensated for the illness to the most degree that they can and then one little nudge will tip them over the edge. Lymphedema is no different in many individuals.

-11-

Dr. Rose noted that in 1997, Plaintiff had lymphedema of the leg.

Dr. Rose explained that

[o]ne of the major lymphatic drainage areas of the body is in the groin or what's called the inguinal nodes. . . . During the course of any incision for an inguinal hernia, some of these lymphatics have to be divided. You don't see them. It's impossible to see them. There's no reason to. But during the course of going through these multiple layers I've talked about, lymphatic channels are entwined.

Michael Witt, M.D., who specializes in urology "with a specific focus on male infertility and sexual dysfunction," also testified as an expert witness for Defendant. Dr. Witt testified that "[l]ymphedema is when that lymph fluid builds up and that can happen in any structure, but when you get more fluid there, you know, coming into the system or unable to leave the system than what should be there, then you get - - it builds up and it's just fluid building up between the tissues." Dr. Witt testified that lymphedema is caused by one of two things, "[e]ither the fluid can't get out because it's blocked or there's an overproduction of fluid, so there's just too much being made for the system to handle." He explained that blockages are caused by "anything that would obstruct or sever those small channels. So things like incisions, malignancies, infection, trauma …."

Dr. Witt testified that hernia surgery can cause lymphedema "if the incision has severed those channels that can take the lymph out of the skin and the scrotum to the site where it's deposited, then you will get obstruction of lymph flow or impairment of lymph flow out of those tissues and the lymph can build up and you can develop lymphedema." However, he testified that there was no relationship between the disruption of the lymphatic system and the pressure from the hernia and opined that recurrent hernia would not cause lymphedema.

Dr. Witt testified that the removal of a testicle would have no effect on the ability to make sperm because the other testicle would compensate. He testified that the removal of a testicle has no effect on the ability to achieve and maintain an erection or to ejaculate. Dr. Witt testified there is no way of knowing whether the loss of the testicle in Plaintiff's case had an effect on testosterone level because we don't know what his level was prior to surgery. Dr. Witt testified that there are medications available including testosterone replacement therapy and drugs to stimulate the testicle to make more testosterone.

Dr. Witt spoke about problems with the use of mesh stating:

there's a growing awareness now that men who have had bilateral hernia repairs with mesh or a single hernia repair with mesh in a situation where there's just a single testicle on that same side have a higher incidence of autovasectomizing themselves due to scarring that develops around the mesh . . . . It's probably anywhere from five to ten percent that you can see men who will end up with no sperm in the ejaculate because the mesh performs a vasectomy.

However, Dr. Witt admitted he is not qualified to testify about hernia repairs because he does not currently do hernia repairs.

William Wray, Ed.D., a licensed clinical psychologist and board-certified professional disability consultant, also testified as an expert witness for Defendant. Dr. Wray reviewed documents, but did not work directly with Plaintiff. Dr. Wray determined that Plaintiff now has a "74 percent loss of access to the job market." Dr. Wray disagreed with Dr. Nadolsky's opinion that Plaintiff could not benefit from training.

Dr. Wray testified that there are some limitations on the tests performed on Plaintiff by Dr. Nadolsky. He explained that a simple error early in the math test could become compounded and distort the true measure of math ability. Dr. Wray further stated that the reading test administered by Dr. Nadolsky really is just a test of word attack, not a true measure of reading ability. Dr. Wray admitted that he did not perform any tests on Plaintiff, but instead utilized Dr. Nadolsky's test results when formulating his opinions. Dr. Wray testified that the size of the database used when doing an analysis would affect the final numbers and explained that he used data from the entire state of Tennessee, not just certain specific counties, to come up with his impairment rating.

Frederick A. Klein, M.D., the urologist who performed the subsequent surgeries on Plaintiff testified at trial. Dr. Klein opined that Defendant did not breach the standard of care. Dr. Klein testified it is within the standard of care to do bilateral repair in the same surgery and that he has done this. However, Dr. Klein testified that in Plaintiff's case, he would have done one side first and then gone back later to do the other side.

Dr. Klein testified he always uses mesh for "every inguinal hernia regardless of the quality of the tissue." He stated that if mesh had been used, the chance of recurrent hernia would have been extremely low. However, Dr. Klein testified that there are numerous ways to fix hernias and that some surgeons use mesh and some don't. He stated:

> I think personally mesh is great, but I've seen complications from mesh also. They can get infected. If that happens it's a huge disaster. It's very difficult to take out. Patients wind up with draining sinus for a long time. I've actually seen mesh get infected and work it's way into the bladder and cause a fistula or a connection between the bladder and the skin so somebody was draining urine out of their skin. So there are complications with basically whatever kind of operation you do for a hernia.

Dr. Klein testified that if Defendant had used mesh, the recurrent hernia would not have happened, but Plaintiff still would have developed lymphedema. Dr. Klein testified that he could not say that Plaintiff's lymphedema was related to anything Defendant did. Dr. Klein testified that the recurrence of the hernia on the right could have been a contributing factor to the lymphedema, but that there are other factors. These other factors include the fact that Plaintiff had hernias on both sides repaired when he was a child that could have interrupted the lymphatic

-13-

drainage, and also include the fact that Plaintiff had "all of the material from his belly, fat, omentum, ureter, that was down in the scrotum for quite a while, that causes a severe local reaction to the tissue in the scrotum itself, and could have affected lymphatic drainage." Dr. Klein testified that the lymphedema also may have been congenital or related to Plaintiff's size. He stated that "the development of lymphedema is multifactorial. A lot of different causes."

Finally, Dr. Klein testified that "if you have a very large hernia and not such good tissue to fix it, once in a while you do have to remove the testicle to get a good repair. And it's certainly possible that testicles and the blood flow is injured by longstanding hernias."

At the appropriate time, Plaintiff and Defendant each asked for a directed verdict on the claim of medical battery. The Trial Court granted Defendant's motion for a directed verdict as to the medical battery claim holding, *inter alia*, that the unforseen orchiectomy was consented to by Plaintiff as the form signed by Plaintiff consented to "the performance of operations and procedures in addition to or different from those contemplated, whether or not arising from presently unforeseen conditions, which the [Defendant] or his associates or assistants may consider necessary or advisable in the course of the operation." The Trial Court found that Defendant "concluded that it was necessary and advisable to remove the organ as a precaution against gangrene" and that this decision was supported by expert testimony. The Trial Court found that the instant case differed from *Blanchard v. Kellum,* because there was no authorization in *Blanchard. Blanchard v. Kellum*, 24 S.W.3d 267 (Tenn. 2000). The Trial Court also found that the instant case differed from *Bates v. Metcalf*, because the consent form in *Bates* required that any additional surgery be required immediately on an emergency basis and no emergency was shown in *Bates. Bates v. Metcalf*, No. E2001-00358-COA-R3-CV, 2001 Tenn. App. LEXIS 879 (Tenn. Ct. App. Dec. 3, 2001), *appl. perm. appeal denied May 6, 2002*.

Defendant also moved for a directed verdict on the issue of medical malpractice claiming that Plaintiff's standard of care expert, Dr. Kroovand, was "not properly qualified to testify" and that "there was no evidence upon which a jury could have based a verdict that the alleged negligence of [Defendant] was the proximate cause of injury to [Plaintiff] . . . ." The Trial Court denied the motion for directed verdict on the claim of medical malpractice and submitted this claim to the jury. The jury deadlocked, and the Trial Court declared a mistrial.

By memorandum order entered March 29, 2004, the Trial Court reconsidered the Defendant's motion for directed verdict on the issue of medical malpractice. The Trial Court found that Plaintiff's expert urologist testified that while many surgeons use mesh, many others never use mesh and that the use of mesh carries its own risks. The Trial Court cited *Ball v. Mallinkrodt Chem. Works*, 381 S.W.2d 563 (Tenn. Ct. App. 1964), stating:

> When there is more than one accepted method of diagnosis or treatment, and no one of them is used exclusively and uniformly by all physicians of good standing, a physician is not negligent for selecting an accepted method of diagnosis or treatment that later turns out to be unsuccessful. This is true even if the method is one not favored by certain other physicians.

-14-

The Trial Court held, *inter alia*, "[u]nless there is other competent evidence to prove that use of mesh in this surgery in this or a similar community was negligence, a jury verdict could not rest on evidence this inconclusive, contradictory, or speculative."

The Trial Court further found "[w]ith respect to whether the failure to use a brand name mesh resulted in the recurrent hernia which resulted in the injury (lymphedema) which would not otherwise have occurred . . . ," Plaintiff's expert urologist testified, in part, that both the failure to use mesh and the recurrence of the hernia contributed to the lymphedema and that no one can say with absolute certainty what caused the lymphedema, but that the recurrence was a probable contributory cause, not the total cause. The Trial Court granted Defendant's motion for a directed verdict on the claim of medical malpractice.

## **Discussion**

Although not stated exactly as such, Plaintiff raises two issues on appeal: 1) whether the Trial Court erred in granting a directed verdict on the claim of medical battery; and, 2) whether the Trial Court erred in granting a directed verdict on the claim of medical malpractice.

As our Supreme Court has instructed:

> In ruling on a motion for directed verdict, trial courts must take the strongest legitimate view of the evidence in favor of the non-moving party, construing all evidence in that party's favor and disregarding all countervailing evidence. *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994). A court may grant the motion only if reasonable minds could reach only one conclusion from the evidence. *Id*. Appellate courts apply the same standard in reviewing the trial court's decision on a directed verdict. *Sauls v. Evans*, 635 S.W.2d 377, 379 (Tenn. 1982).

*Gaston v. Tennessee Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003).

We first will consider whether the Trial Court erred in granting a directed verdict on the claim of medical battery. Our Supreme Court instructs that:

> A simple inquiry can be used to determine whether a case constitutes a medical battery: (1) was the patient aware that the doctor was going to perform the procedure (i.e., did the patient know that the dentist was going to perform a root canal on a specified tooth or that the doctor was going to perform surgery on the specified knee?); and, if so (2) did the patient authorize performance of the procedure? A plaintiff's cause of action may be classified as a medical battery only when answers to either of the above questions are in the negative. If, however, answers to the above questions are affirmative and if the plaintiff is alleging that the doctor failed to inform of any or all risks or aspects associated with a procedure, the patient's cause of action rests on an informed consent theory.

*Blanchard v. Kellum*, 975 S.W.2d 522, 524 (Tenn. 1998).

The *Blanchard* Court further instructed that "[t]he primary consideration in a medical battery case is simply whether the patient knew of and authorized a procedure. This determination does not require the testimony of an expert witness." *Id.*

In the instant case, the questions as to the claim for medical battery are: did Plaintiff know Defendant was going to perform this procedure, the orchiectomy; and, if so, did Plaintiff authorize performance of this procedure. The consent form signed by Plaintiff prior to the surgery states, in pertinent part:

> I consent to the performance of operations and procedures in addition to or different from those contemplated, whether or not arising from presently unforseen conditions, which the above name physician or his associates or assistants may consider necessary or advisable in the course of the operation.

If all that was presented to the jury on this medical battery claim was the signed consent form, the issue before us of whether the Trial Court erred in granting a directed verdict on the medical battery claim would be less complicated. However, the consent form was not the only evidence on that issue presented to the jury as the Plaintiff testified that he specifically asked Defendant prior to the surgery if the surgery would "affect me in any way in my manhood or anything happen down there that I should need to know about." Given this testimony and the doctor's response, we believe, even given the signed consent form, that reasonable minds could disagree as to whether Plaintiff either was aware Defendant was going to perform this procedure or whether Plaintiff authorized performance of this procedure.

We acknowledge that this is a very close question given the consent form signed by Plaintiff. We note that the consent form, at least as applicable to the orchiectomy, is general and nonspecific in its language. Plaintiff's question to the Defendant and Defendant's response, at least as testified to by Plaintiff, is specific. Applying the very strenuous directed verdict standard, this is not a situation where reasonable minds could reach only one conclusion from the evidence. We, therefore, hold that the Trial Court erred in granting a directed verdict on the claim of medical battery. We reverse the directed verdict on the claim of medical battery and remand this case for a new trial on Plaintiff's claim of medical battery.

We next consider whether the Trial Court erred in granting a directed verdict on the claim of medical malpractice. In a medical malpractice action in Tennessee, a plaintiff has the burden of proving:

> (1) The recognized standard of acceptable professional practice in the profession and the speciality thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115 (a) (2003).

The Trial Court found that Plaintiff's expert urologist testified that while many surgeons use mesh, many others never use mesh and that the use of mesh carries its own risks. The Trial Court cited *Ball v. Mallinkrodt Chem. Works*, 381 S.W.2d 563 (Tenn. Ct. App. 1964), stating:-

When there is more than one accepted method of diagnosis or treatment, and no one of them is used exclusively and uniformly by all physicians of good standing, a physician is not negligent for selecting an accepted method of diagnosis or treatment that later turns out to be unsuccessful. This is true even if the method is one not favored by certain other physicians.

The Trial Court held, *inter alia*, "[u]nless there is other competent evidence to prove that use of mesh in this surgery in this or a similar community was negligence, a jury verdict could not rest on evidence this inconclusive, contradictory, or speculative."

The Trial Court further found "[w]ith respect to whether the failure to use a brand name mesh resulted in the recurrent hernia which resulted in the injury (lymphedema) which would not otherwise have occurred . . .", Plaintiff's expert urologist testified that both the failure to use mesh and the recurrence of the hernia contributed to the lymphedema and that while no one can say with absolute certainty what caused the lymphedema, the recurrence was a probable contributory cause, but not the total cause. The Trial Court discussed in detail Plaintiff's expert urologist's testimony on this issue. The Trial Court noted that "it's important to recall that the expert [plaintiff's urologist] could not even say that the use of mesh would have more likely than not prevented the recurrence and would not have resulted in a 'disaster' in this difficult surgery which he was familiar with only from his residency." After discussing this testimony in detail, the Trial Court specifically found that Plaintiff's expert testimony was insufficient to allow a "reasonable jury" to conclude that Plaintiff had met his burden as to his medical malpractice claim.

After our thorough review of the evidence presented to the jury, we agree with the Trial Court's analysis and decision on the medical malpractice claim. Plaintiff failed to establish that the standard of care required the use of mesh and further failed to establish that Defendant's actions or omissions caused Plaintiff to suffer damages that would not otherwise have occurred. In addition, Plaintiff failed to establish that attempting to perform repairs on both sides during the same surgery fell below the standard of care, or that it caused Plaintiff to suffer damages that would not otherwise have occurred. Taking the strongest legitimate view of the evidence in favor of Plaintiff, construing all evidence in Plaintiff's favor and disregarding all countervailing evidence, as we must, we find,

-17-

as did the Trial Court, that reasonable minds could reach only one conclusion. We, therefore, affirm the directed verdict on the claim of medical malpractice.

## **Conclusion**

The judgment of the Trial Court is affirmed in part, reversed in part, and this cause is remanded to the Trial Court for a new trial solely on Plaintiff's claim for medical battery. The costs on appeal are assessed against the Appellees, Yung Gil Lee, P.C. and Yung Gil Lee, M.D.

_____
D. MICHAEL SWINEY, JUDGE